790 A.2d 842

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES, AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–RESPONDENTS.

Argued September 25, 2001—Decided February 21, 2002.

*David G. Sciarra,* Executive Director, Education Law Center, and *Paul L. Tractenberg,* argued the cause for movants (*Mr. Sciarra,* attorney; *Mr. Sciarra* and *Jennifer R. Weiser,* on the briefs).

*Nancy Kaplen,* Assistant Attorney General, argued the cause for respondents (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Ms. Kaplen, Michelle Lyn Miller* and *Michael C. Walters,* Deputy Attorneys General, on the briefs).

*Maxim A. Thorne,* Deputy Director, argued the cause for *amici curiae* New Jersey Headstart Association, National Association

for the Advancement of Colored People, Early Childhood Coalition of Paterson, and Early Childhood Coalition of Newark (*John D. Atlas*, Executive Director, Passaic County Legal Aid Society, attorney; *Mr. Thorne* and *Maya Horton Harris*, on the letter brief).

*Richard E. Shapiro* argued the cause for *amici curiae* City of Elizabeth Board of Education and City of Passaic Board of Education.

*Francis X. Journick, Jr.*, argued the cause for *amicus curiae* Board of Education of the City of Perth Amboy (*Wilentz, Goldman & Spitzer*, attorneys).

*Cecelia M. Zalkind* argued the cause for *amicus curiae* Association for Children of New Jersey (*Ms. Zalkind*, attorney; *Cynthia C. Rice* and *Keri E. Logosso*, on the letter brief).

*Richard A. Friedman*, submitted a brief on behalf of *amicus curiae* New Jersey Education Association (*Zazzali, Fagella & Nowak*, attorneys).

*Paulette Brown*, submitted a letter in lieu of brief on behalf of *amicus curiae* The Black Minister's Council of New Jersey (*Duane Morris & Heckscher*, attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

This is the second motion in aid of litigants' rights filed by the Education Law Center (ELC or plaintiffs) since the Court decided *Abbott v. Burke*, 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*). See *Abbott v. Burke*, 163 *N.J.* 95, 748 *A.*2d 82 (2000) (*Abbott VI*). As before, the ELC alleges that the Commissioner of Education (Commissioner) has failed to comply with the Court's mandate in *Abbott V*, and now *Abbott VI*, and requests that we order specific relief in respect of preschool programs in the Abbott districts, including the appointment of a judge of the Superior Court to hear and resolve anticipated disputes. For the reasons set forth in this opinion and in our Order of October 22, 2001, we have provided a schedule for decision-making by the Executive Branch and by our

Appellate Division to ensure that Abbott districts' preschool program and budget proposals are timely reviewed and that "final dispositions are issued in time for the 2002–2003 school year." *Abbott v. Burke*, No. M–1131, at 3 (N.J. Oct. 22, 2001) (October Order). We have, however, declined to appoint a Standing Master for Abbott matters. Having "commit[ted] in *Abbott V* and *Abbott VI* to use of the administrative process established by the Legislature for Executive Branch decision-making," we find no reason to retreat from that commitment now. *Ibid.*

This opinion amplifies our October Order and clarifies further our direction in *Abbott VI*.

## I

### *Process Issues*

In *Abbott V*, the Court determined that disputes involving educational programs in the Abbott districts "shall be considered 'controversies' arising under the School Laws[,] *N.J.S.A.* 18A:7A–1 to 7F–34." 153 *N.J.* at 526, 710 *A.*2d 450. Such controversies, we noted, may be heard as contested cases by an Administrative Law Judge, whose recommendation the Commissioner could approve or disapprove, with the final decision left to the State Board of Education on appeal by the losing party.[1] Even when the ELC returned to the Court in July 1999 claiming non-compliance by the Commissioner with the mandates of *Abbott V*, there were factual and legal issues concerning preschool programs pending before the Chief Judge of the Office of Administrative Law (OAL) that we did not resolve when we issued *Abbott VI*. See *Abbott VI, supra,* 163 *N.J.* at 120, 748 *A.*2d 82. In *Abbott VI*, we reaffirmed our previous determination sustaining in large measure the Commissioner's proposals for the operation of quality half-day pre-

---

[1] The Legislature subsequently determined that the Commissioner would be the final decision-maker in the resolution of such disputes rather than the State Board of Education. See *Appropriations Act of Fiscal Year 2001, L.* 2001, *c.* 130; *Appropriations Act of Fiscal Year 2000, L.* 2000, *c.* 53.

school in the Abbott districts. Because the disputes centered around substantive educational standards, teacher certification, class size, daycare-provider contracts, adequate facilities, supplemental funding, and community outreach, we focused on the resolution of those issues in order to provide further guidance and expedite program implementation. We anticipated that the unresolved matters would be timely reviewed through the administrative process.

Our opinion in *Abbott VI* was filed on March 7, 2000. In April 2001, Acting Chief Judge Masin (Chief Judge) released his Initial Decision in *In re Abbott Global Issues*, No. EDU 3246–01 (OAL April 20, 2001) (OAL Initial Decision). As its name suggests, that case arose out of a set of so-called systemic issues identified by the ELC prior to the Court's decision in *Abbott VI* and modified thereafter to reflect our ruling. Those issues were considered by the ELC to "involve general systemic deficiencies in the manner and process by which the [Department of Education] has responded to its [Abbott preschool] obligations." *Id.* at 4. Individual district-related cases remained with other Administrative Law judges and were apparently withdrawn, settled or held awaiting a decision in *In re Abbott Global Issues*.

When, on May 17, 2001, plaintiffs moved in aid of litigants' rights before this Court, we held review of their application pending the Commissioner's final decision in response to the Chief Judge's recommendations. Under the legislative scheme for administrative adjudication, it is the Commissioner's task to consider the policy ramifications of the Abbott cases. The Commissioner's final decision is therefore an integral and necessary step in the administrative process. *See, e.g., N.J.S.A.* 52:14F–7; *IMO Certain Sections of the Uniform Administrative Procedural Rules*, 90 *N.J.* 85, 91–92, 447 *A.*2d 151 (1982). After the issuance of the Commissioner's Decision in June 2001, and after supplemental briefing and oral argument in September 2001, we ordered relief in the form of time frames for expeditious dispute resolution

within the structure established by the Legislature. See October Order.

This procedural history is important. Although the venue for Abbott disputes has been established in the Administrative Procedures Act, *Abbott V, supra,* 153 *N.J.* at 526, 710 *A.2d* 450, the chronology of this dispute informs us that these matters are not promptly resolved. At best, the Department of Education (DOE or Department) has been slow to respond to the districts' submissions. At worst, the Department's responses have provided little guidance so late that resolution cannot be accomplished before the next group of children is scheduled to arrive in September. In short, on the question of timely disposition, the record is dismal.

Timely disposition of contested Abbott cases is critical for children living in the Abbott districts. Decision-making in respect of programs for the next school year must be completed in time for implementation *in* the next school year if the process is to be meaningful. As more parents become aware of the opportunity to enroll their children and do so, classrooms must be available, certified teachers must be hired, and instructional materials must be prepared, to mention but a few of the many necessary components of an expanding preschool program. When that does not happen, the high quality educational experience promised for the Abbott districts cannot be fully implemented from year to year. When three- and four-year-old children are denied the opportunity to attend a quality preschool, the advantages of early exposure to that educational experience are irretrievably lost.

But the Court's October Order does more than establish a schedule for the submission, review and appeal of Abbott District preschool program and budget proposals. In *Abbott VI,* we said,

Cooperation between the districts and the DOE is essential to this effort if it is to succeed. For too long, there has been suspicion and distrust. The [Association for Children of New Jersey] has built a coalition of educators and providers that demonstrates the value of collaboration and consensus building. It is our hope that the adversarial relationship between the parties will give way to a cooperative effort focused on the provision of high-quality preschool programs for children in the Abbott districts. The children deserve no less.

[163 *N.J.* at 120–21, 748 *A.*2d 82.]

That cooperative effort is only possible if the DOE staff works with the Abbott districts in the preparation of their plans, and continues through the administrative appeal process to accept supplemental documentation and to assist the districts in curing any deficiencies that have caused the Department to reject any plan.

Our October Order also denied ELC's request for a Standing Master. Adherence to an administrative process tied to expeditious decision-making that includes cooperative efforts toward the resolution of disputes is greatly preferred over a structure superimposed by the courts. We do not find deficiencies in the implementation of Abbott preschool programs sufficient to justify the extreme remedy of court supervision. We remain troubled, however, by the delays and the DOE's apparent reluctance to deal with funding and other difficult but determinative issues in a timely manner. *Abbott V* was decided more than three-and-a-half years ago. The districts' Applications for State School Aid indicate that, as of October 13, 2000, just over 22,000 preschool students were enrolled in the Abbott programs. According to plaintiffs, 34,600 three- and four-year-old children were expected to attend those programs in 2001–02. Although estimates vary, as many as 58,600 children may have been eligible to attend as of September 2001. Clearly, much remains to be done.

Nonetheless, we sharply disagree with our dissenting colleague regarding the progress made in the development and implementation of the Abbott preschool programs. He continues to urge court supervision of responsibilities entrusted to the Executive and Legislative branches of our government by the New Jersey Constitution. This record cannot, however, support the extraordinary remedy the dissent would grant. It was in 1998 in *Abbott V,* that this Court first considered the specific preschool proposals that had been presented in hearings before Special Master Judge King. 153 *N.J.* at 493, 710 *A.*2d 450. During the intervening four years, as required by *Abbott V, id.* at 501–02, 710 A.2d 450, the

State has undertaken whole school reform in the Abbott districts, including the preschool programs at issue in this case. Today, three out of every five children in the Abbott districts participate in those programs. Much has been accomplished. In short, because of the progress made and because of the ongoing effort to fulfill the *Abbott* mandates, we cannot justify a new and superseding role for the courts in this matter.

We are further encouraged by the collaborative effort now underway. By Notice of Motion filed on December 20, 2001, plaintiffs sought a stay for one month of the January 5, 2002 deadline established by the Court for the DOE's initial determinations on the Abbott districts' 2002 preschool program and budget proposals. Because a new Governor was to take office on January 15, 2002, the parties argued that a one month extension for the DOE, with a concomitant extension for any subsequent appeals, would both facilitate decision-making by the incoming administration and permit the appellate process to be completed before the state budget is approved. The ELC and Governor's Special Counsel informed the Court that representatives from the Abbott districts, community providers, Head Start, and the Early Care and Education Coalition are participating in this effort with the plaintiffs and the new administration. In light of our consistent call for cooperation between the parties, we approved plaintiffs' request on December 21, 2001.[2] We anticipate that even if some of the Abbott districts are unable to work out their differences with the DOE within the extended time frame, there will be

---

[2] On February 11, 2002, we granted plaintiffs' second application for modification of the schedule established by the Court. With the State's consent, plaintiffs sought and received a two-week extension to February 25, 2002, for filing notices of administrative appeal in contested cases. All subsequent deadlines were extended two weeks. We note also that on February 19, 2002, Governor James E. McGreevey issued Executive Order No. 6, which creates the Abbott Implementation and Compliance Coordinating Council. The Council's broad charge is based, in part, on a stated desire to "continue and expand" on a collaborative process that has already begun. Exec. Order No. 6 (Feb. 19, 2002).

continuing efforts to do so throughout the administrative appeal process.

## II

### *Systemic Issues*

As Chief Judge Masin points out in his Initial Decision, the question whether the DOE has met the Court's mandates in *Abbott V* and *Abbott VI* presents a moving target for review. OAL Initial Decision at 36–37. During the period after this case was filed in 1999, up to April 2000 when the OAL Initial Decision issued, *Abbott VI* was decided and the Department promulgated regulations, published Early Childhood Program Expectations: Standards of Quality (*Expectations*),[3] and provided training for district personnel. OAL Initial Decision at 36. Even as to the global issues, the factual context was changing. As for the parents and students (from Paterson, Jersey City, Newark and West New York) represented by the ELC, the Chief Judge observed that "the necessary level of evidence surrounding the[ir] actual individual and particularized needs [was] not before [him]." *Id.* at 37. Even so, the parties continued to present, by certifications to this Court, unfolding "factual" information relating to both systemic and district specific issues. We are unable to resolve district specific issues on this record and anticipate that they will be either cooperatively resolved for next year as the Department reviews the district plans submitted on November 15, 2001 or through the administrative appeal process. We will therefore address only those systemic or global issues considered by Chief Judge Masin and the Commissioner.

### A. *Substantive Educational Standards*

In *Abbott VI*, we required the Department to provide "[s]ub-stantive educational guidance for all Abbott district preschool

---

[3] See *infra* at 547–48, for a description of the *Expectations* document.

programs ... by April 17, 2000" in preparation for the 2000–01 school year. 163 *N.J.* at 107, 748 *A.*2d 82. That requirement stemmed from a set of related concerns: the need for criteria against which district programs can be evaluated and for a mechanism "to prevent the development of a two-tiered system in which one group of children is offered daycare and another group is offered high-quality preschool." *Ibid.* Substantive educational standards provide goals for teachers and students alike, as well as direction for achieving those goals in the classroom.

In response to our mandate in *Abbott VI,* the DOE adopted the *Expectations* in April 2000. DOE, *Expectations, at* http://www.state.nj.us/njded/ece/expectations (last visited on Dec. 31, 2001). Similar to the Core Curriculum Content Standards (CCCS) [4] for grades K—12, the *Expectations* outline the goals of preschool education without, however, specifying the details of a curriculum aimed at achieving the desired results. Subsequently, on December 17, 2001, the DOE proposed an amendment to *N.J.A.C.* 6A:24–3.3(a)(4) requiring districts to integrate the goals of the *Expectations* into their preschool programs. 33 *N.J.R.* 4186, 4187.

Because the DOE's position on the *Expectations* is that they "are not meant to be used in isolation, but as one of the many resources that are essential to building a developmentally appropriate early childhood program," *Expectations, supra,* at Preface, ¶ 3, the Department promised the creation of a curriculum strategy, the Early Childhood Education Curriculum Framework (*Framework* ), to supplement the *Expectations* with substantive

---

[4] The DOE describes the CCCS as a " 'road map' for the development of challenging general education curricula by local school districts." DOE, *Core Curriculum Content Standards for Students with Severe Disabilities, at* http://www.state.nj.us/njded/specialed/cccsssd_faq.htm (last visited on Dec. 31, 2001). The CCCS addresses seven major content areas: language arts literacy, mathematics, science, social studies, visual and performing arts, comprehensive health and physical education, and world languages. *Ibid.* Each content area includes a set of standards and cumulative progress indicators identifying the level of achievement that students must attain by the end of certain grades. *Ibid.*

guidance and to aid in the realization of the *Expectations.* DOE, *Framework,* at http://www.state.nj.us/njded/ece/framework/index.html (last visited on Dec. 31, 2001). The DOE has not issued a final version of the *Framework,* and, therefore, plaintiffs ask us to declare that the DOE has failed to fulfill the mandate of *Abbott VI.* Plaintiffs submit that the *Expectations* alone do not provide the guidance necessary for districts and community providers to implement uniform, high-quality preschool education in the Abbott districts.

The Commissioner has advised that the development of the *Framework* has significantly advanced. DOE, *Early Childhood Education: Advancing Implementation,* Ch. 3(a), at http://www.state.nj.us/njded/ece/implementation (*Advancing Implementation* ) (last visited on Dec. 31, 2001). In September 2001, the Department released, in draft form, an extensive substantive chapter on strategies to meet preschool expectations and to guide assessments of the children's progress. The chapter covers social and emotional development, creative arts, mathematics, science, and other areas. DOE, *Framework,* at http://www.state.nj.us/njded/ece/framework/doc. Continued progress with the *Framework* is essential for the scheduled review by the early childhood education community to be effective and for educators to have adequate time to plan programs for the 2002–03 school year. For the current school year, the Abbott districts are integrating the goals of the *Expectations* with nationally recognized preschool curriculum models. Twenty-four Abbott districts employ one or more of these recognized models: five use Curiosity Corner, eleven use High/Scope or their own program based on High/Scope, four use Creative Curriculum, one uses Scholastic's Early Childhood Workshop, two use a hybrid of at least two of the aforementioned programs, one uses a hybrid of Abecedarian and the Kellog Five Star Project, and six have developed their own curricula.

■ In his June 1 decision, the Commissioner "direct[ed] ... the Department [to] revise its practices and procedures as may be

necessary to include ... review" of "district curriculum plans" and to remain faithful to the *Framework* development schedule established in the Department's *Advancing Implementation* document. *In re Abbott Global Issues,* No. 171–01, slip op. at 73 (Commissioner of Education June 1, 2001) (Commissioner Decision); *see also N.J.A.C.* 6A:24–3.3(a)(4). DOE review of curriculum plans will assist the districts in compliance with *Framework* strategies. See proposed amendment to *N.J.A.C.* 6A:24–34 at 33 *N.J.R.* 4186, 4187 (Dec. 17, 2001). To ensure availability of detailed curricula for use in the 2002–03 school year, and to meet the DOE's time frame for implementation workshops, the DOE must, as scheduled, complete a final draft of the *Framework* by April 30, 2002. See *Advancing Implementation.*

### B. *Enrollment and Recruitment*

Enrollment in Abbott preschool programs is not compulsory. If the promise of early childhood education is to be met, parents in the Abbott districts must not only be aware of the opportunity offered, but must be informed about the advantages of participation for their children. In some communities, recruitment will be critical to the success of the Abbott preschool venture.

The issue in *Abbott VI* concerned the "need for community outreach to inform parents about the availability of preschool for three- and four-year old children in the Abbott districts." *Abbott VI, supra,* 163 *N.J.* at 119, 748 *A.*2d 82. The Court anticipated at that time that existing enrollments could be examined in order to determine, based on the projected preschool population, "whether parents in the community are aware of the district's preschool programs." *Ibid.* Low enrollments would "trigger a determination" of parental awareness and, then, "concerted outreach efforts to improve [those] enrollments." *Ibid.*

At present, if the number of children "in the early childhood programs do[es] not exceed 50 percent of the projected preschool population in the district, the [local] board [is required to] develop a corrective action plan to increase enrollments which shall be

approved by the Commissioner and then implemented by the district." *N.J.A.C.* 6A:24–3.3(a)(8). The issue addressed below by the Chief Judge was, therefore, "whether the Department, faced with evidence of such 'low' enrollments, ha[d] taken appropriate steps to require that the districts determine the awareness of parents about . . . preschool programs and, as appropriate, adopt plans to promote awareness and . . . encourage enrollment." OAL Initial Decision at 42. A problem arose, however, because of a disagreement between the parties "regarding the appropriate manner of determining the projected number of three- and four-year-olds in a district." *Ibid.* When outreach efforts are initiated based on the percentage of total eligible students, accuracy in projecting that number is essential.

Before the Chief Judge, the Department's expert asserted, without documentation, that "each district other than Elizabeth is serving at least 50% of its 'projection.'" *Ibid.* Plaintiffs' expert used his own methodology and calculated the number of eligible three- and four-year-old students in each district at twice the district's first-grade enrollment. *Ibid.* Using that figure and comparing it to the actual number of students enrolled, plaintiffs' expert concluded that twelve districts had enrollment rates below fifty percent, thereby triggering the community outreach corrective action requirement for those districts. *Ibid.* On the record before him, the Chief Judge was unable to determine which expert's calculation, if any, yielded the correct measurement of enrollment. *Id.* at 44. Thus, he was unable to adjudicate the issue whether, in respect of any Abbott district, the community outreach requirement had been triggered. In lieu of that determination, the Chief Judge urged the DOE to adopt a uniform standard through the administrative rulemaking process to measure districts' preschool enrollment and to determine the need for community outreach. *Id.* at 45. The Commissioner "fully concurred" with the Chief Judge and directed the development of appropriate regulations. Commissioner Decision at 74–75.

On November 5, 2001, proposed amendments to *N.J.A.C.* 6A:24–3.3 were published in the New Jersey Register. 33 *N.J.R.* 3716, 3717–18. By those amendments, the Department has set forth a uniform method for calculating the universe of eligible three- and four-year-old children that averages the total number of public and non-public school kindergarten and first grade pupils in a district. *N.J.A.C.* 6A:24–3.3(a)(8). "[A]ppropriate adjustments" may be made to that figure "based upon the documented history of the actual enrollments in the three- and four-year-old programs over the last three years," *id.* at (a)(9)(i), and to reflect "any factors in the community that might affect the growth rate in the three- and four-year-old populations, such as a large employer moving in or out of the district, or a new housing development. . . ." *Id.* at (a)(9)(ii). This method yields "the minimum projected number of three-year-old and four-year-old children that must be served in the next school year. . . ." *Id.* at (a)(9)(iii). In addition, the DOE has proposed an amendment to *N.J.A.C.* 6A:24–3.3(a)(8) that increases the outreach trigger from the current 50% to 90% by the 2003–04 school year. *Id.* at (b)(1) (moving the 2001–02 trigger to 70%, the 2002–03 trigger to 80%, and the 2003–04 trigger to 90%). We note as to those proposals that the districts' success in conducting outreach programs can be reviewed only if a uniform method for calculating projected enrollments is used. The variability that results when each district is permitted to develop its own methodology makes it considerably more difficult for the DOE to evaluate effective strategies to improve preschool attendance.

In the end, it is the outreach effort that is critical to the success of the Abbott programs. We recognize that even if every parent is informed about the availability of preschool, not all parents will choose to enroll their children. As the State's experts reported in *Evaluation of Early Childhood Programming in the 30 Abbott School Districts: Phase 1 Report* (Feb.2001), some parents may not wish to "put their child[ren] in the 'world' too soon," while others may prefer a more family-oriented child care environment or the flexibility of alternative child care options. *Id.* at 10. The

decision not to enroll a child in the district's preschool program also may be affected by cultural attitudes, including "distrust of the educational system," among other things. OAL Initial Decision at 43.

The goal is to inform parents of preschool age children about the opportunity to enroll their children in the Abbott programs. In other words, children should not be denied the benefits of a quality preschool program simply because their parents do not know it exists. This appears to be an area where partnering with community organizations might be of great assistance in achieving outreach goals. By way of example, we are informed that the Department of Human Services entered into a $1.3 million contract with the Hispanic Directors Association of New Jersey (Association) to provide recruitment services in Spanish-speaking communities. According to the State, these efforts have borne fruit. As of May 1, 2001, 1,789 of the 3,182 families contacted by the Association advised that they would enroll their children in an Abbott preschool program. Such results are encouraging.

█▪ Nonetheless, thousands of children have not been enrolled in preschool in the Abbott districts. The DOE must work with the districts to develop corrective action plans when the districts do not meet enrollment goals and must review, with the districts, the effectiveness of these plans during the implementation phase.

### C. *Head Start/Community Providers*

Plaintiffs and Amici allege that the Commissioner of Education has willfully violated the Court's Abbott mandates by unlawfully excluding Head Start programs from district plans and by insufficiently funding community providers generally.

In *Abbott V* and *Abbott VI*, we considered the use of community daycare centers as part of the Abbott preschool program. At that time, both the DOE and the plaintiffs supported the use of community daycare centers because, as a practical matter, "a readily-available source of staff and facilities could be found in the DHS-licensed programs then operating in the Abbott districts."

*Abbott VI, supra,* 163 *N.J.* at 114, 748 *A.2d* 82. Indeed, the DOE had adopted *N.J.A.C.* 6:19A–3.3(b) (revised and now found at *N.J.A.C.* 6A:24–3.3(b)), which required districts to collaborate with community providers "whenever practical." *Abbott VI, supra,* 163 *N.J.* at 114–15, 748 *A.2d* 82. In *Abbott VI,* the issue was not whether community daycare centers should be included in the district program, but whether they could be included, because "they are not designed to provide a preschool educational experience that prepares disadvantaged children to achieve academically in school." *Id.* at 114, 748 A.2d 82. We approved the use of community providers with the caveat that daycare centers could not be incorporated into Abbott district programs unless they met the stringent requirements imposed on those programs. In other words, a two-tier system that denied any child a quality preschool experience would not be permitted. It was in that context that we stated, "When an existing daycare center is unable or unwilling to comply with those requirements, cooperation with that center would be presumptively not 'practical' under *N.J.A.C.* 6:19A:3.3(b)." *Abbott VI, supra,* 163 *N.J.* at 115, 748 *A.2d* 82.

Today, plaintiffs complain that certain of the Head Start programs have been excluded from the district plans by the DOE. We agree with the Chief Judge that *N.J.A.C.* 6A:24–3.3(b) [5] requires the districts to "wherever possible make use of existing community-based programs to deliver preschool services rather than duplicate such programs." OAL Initial Decision at 46. We also read

---

[5] *N.J.A.C.* 6A:24–3.3(b) states in pertinent part:

The board shall cooperate with or utilize a DHS-licensed child care provider whenever practical to implement required early childhood education programs and shall not duplicate programs or services otherwise available in the community. When the board enters into a contract with a DHS-licensed child care provider, the contract shall be in a form provided by or approved by the Department and shall include clear expectations, necessary supports and accountability measures. The board shall contract with a DHS-licensed child care provider to provide services to preschool children when that provider is able and willing to comply with ... requirements [pertaining to teacher-to-student ratio, master teachers, supplemental programs, teacher qualification, and family workers].

the DOE regulation to establish a presumption that duplication of services is not permitted unless substantial reasons are set forth in the Department's decision document.

That said, we are troubled by reports that Head Start programs are facing decreasing enrollment, escalating loss of staff, and financial difficulties. We are told that certified staff has fled to district-run programs, lured by the higher compensation packages those programs offer. It is specifically claimed that seventeen Head Start programs in Abbott districts have lost more than 125 certified teachers in the last three years, and that all of the education staff and social workers have left the Head Start program serving Asbury Park, Long Branch, Neptune, and Keansburg.

We recognize the invaluable service that Head Start provides in the Abbott districts. In *Abbott VI*, we observed that Head Start "present[s] unique issues." 163 *N.J.* at 116, 748 *A.*2d 82. Designed to fit the needs of the community, Head Start offers low-income children comprehensive medical, dental, mental health, nutrition, family involvement, and transportation programs, and has been instrumental in increasing the school readiness of young children from low-income families. United States Department of Health and Human Services, Administration for Children and Families, *Head Start Children's Entry into Public School: A Report on the National Head Start/Public School: Early Childhood Transition Demonstration Study* (2000) (reporting that Head Start children enter school "ready to learn" and able to achieve at national academic norms). It has been represented to us that because of Head Start's unique features, many parents prefer Head Start programs over district-run programs.

Nonetheless, "[s]tate preschool standards are ... more demanding than Head Start program standards," *Abbott VI, supra*, 163 *N.J.* at 116, 748 *A.*2d 82, and, therefore, the DOE must supplement existing Head Start funding with state funding sufficient to allow Head Start to meet state standards and to retain certified teachers. The Chief Judge expressed his frustration at

the lack of a record in respect of an alleged breakdown in discussions between state officials and Head Start providers. OAL Initial Decision at 48. We have been informed that the disputes are not about the use of Head Start as part of the Abbott district preschool plans, but, rather, the cost of bringing Head Start up to state standards.

To avoid "duplicat[ing] programs or services otherwise available in the community," as required by *N.J.A.C.* 6A:24–3.3(b), districts should utilize Head Start providers unless they are not "able and willing to comply" with Abbott preschool standards, or unless the cost of doing so is demonstrably more expensive than other high-quality alternatives. The districts must develop budget proposals based on a careful analysis of a provider's pre-existing obligations and funding sources. The DOE need not offer additional funding for services designed to meet federal regulations unless there is a need to improve those services to meet state standards. In sum, reasonable supplemental funds must be provided so that Head Start (and other appropriate community providers) can meet the more demanding State preschool requirements.

Ensuring that qualified, certified teachers are available for all Abbott programs is an essential component of adequate state funding. Districts must address salary parity between district-run and community provider-run programs in their needs assessment evaluations. If community providers, such as Head Start, can demonstrate an inability to retain qualified staff due to salary parity problems, the DOE must consider additional funding for teacher salaries.

Finally, we note that *N.J.A.C.* 6:11–5.2(f) "grandfathers" certified elementary school teachers with two years preschool experience by waiving the requirement of *Abbott VI* that they obtain an instructional certificate with a P–3 endorsement in order to be hired as teachers in Abbott preschool programs.[6] We find the

6 *N.J.S.A.* 6:11–5.2(f) states,

grandfather provision to be a reasonable response to the establishment of new certification requirements that would otherwise negatively affect experienced, certified teachers. We are confident the exemption will not compromise the education of any preschool children. The DOE, which historically grandfathers all certificate holders affected by new requirements, strictly limited *N.J.A.C.* 6:11–5.2(f) to those teachers with the training and experience it judged fully adequate to the task. The parties agree that there is a teacher shortage that affects both community daycare providers and district-run preschools. Additional funding, when appropriate for community providers, will help them to retain qualified teachers, but it will not increase the pool of qualified teachers.[7]

## D. The Role of Assessment/Funding

The question of funding a "thorough and efficient" education in the Abbott districts has plagued this litigation from the start. See *Abbott v. Burke,* 100 *N.J.* 269, 495 *A.2d* 376 (1985). In *Abbott VI,* we repeated our concern that "adequate funding remains critical to the achievement of a thorough and efficient education." 163 *N.J.* at 118, 748 *A.2d* 82 (quoting *Abbott V, supra,* 153 *N.J.* at 517–18, 710 *A.2d* 450). And, yet again, plaintiffs complain that the DOE has neither provided sufficient budgetary guidance to the districts, nor allocated funding based on actual need. More

---

Any teacher holding an elementary school endorsement with two academic years of relevant experience may teach children in preschool through grade three in a public school or a Department of Human Services facility. Relevant experience means having full-time teaching responsibility for children in preschool settings.

[7] *Amicus curiae* New Jersey Education Association asks the Court, in light of the shortage of qualified preschool teachers, to allow current holders of N–8 and K–8 endorsements to teach preschool even when they have not had preschool experience. That issue was not addressed by plaintiffs and was not raised before the Chief Judge or the Commissioner. Should the Commissioner, with his expertise in respect of appropriate qualifications for teachers, expand the eligible pool of preschool teachers to include N–8 and K–8 certified teachers because he finds it necessary to remedy a documented preschool teacher shortage in Abbott districts, then that issue would be ripe for review.

specifically, plaintiffs claim that the DOE has imposed upon the districts pre-established, arbitrary "per-student" funding amounts that do not take into account real "per-student" costs. The Chief Judge framed the global question as "whether there are systemic factors that exist that undermine the ability of the districts to obtain the funding they need or that limit the ability of the Department to assess that need." OAL Initial Decision at 50.

Although he acknowledged that the funding disputes of individual districts were not a proper subject for review in the global issues matter (and should instead be resolved in separate proceedings), the Chief Judge nonetheless examined the funding experiences of the Paterson and Jersey City School Districts to aid in his inquiry on the systemic issue. He found that neither the Paterson or Jersey City application, nor the DOE's responses to those applications, provided adequate bases for the funding amounts initially requested or ultimately granted. Paterson, for example, at one point changed its per-student funding proposal, but failed to submit any information "to allow anyone to understand whether [the amount requested was] based upon an assessment that the ... figure [was] adequate to provide a well-planned, high-quality education." *Id.* at 52.

The DOE was equally unhelpful in its responses. Its reply to Jersey City was described by the Chief Judge as containing "blanket statement[s]" providing "no explanation [in respect of] the sufficiency" of the funding amounts approved. *Id.* at 53. Of particular concern to the Chief Judge was the prevalence of DOE funding approvals of $4,500 per student with no explanation whether that amount was sufficient. In short, he found "no evidence that the districts made a program-by-program, center-by-center assessment" of the funding required to deliver an "appropriate education." *Id.* at 54. Nor was there any evidence that "if such assessments were performed[,] ... the DOE reviewed these assessments or even saw them." *Ibid.* As a result, it was not possible to determine whether the funding amounts requested by the districts and/or granted by the DOE were "adequate" for

the provision of "fully compliant" Abbott preschool programs. *Ibid.* At the same time, the funding process and the DOE's responses suggested an "appearance of ... arbitrariness." *Id.* at 53.

The Chief Judge concluded that the districts must "conduct reasonable evaluations, reviews and assessments of themselves, their preschool children and their providers' circumstances and ... use these as aids in formulating plans for the implementation of Abbott preschool." *Id.* at 55. He required those findings to be "made available to the DOE so that it too can, as it must, conduct reasonable reviews and assessments of the districts' actions." *Ibid.* The Chief Judge also concluded that clear guidelines must be issued by the DOE so that districts will be aware of the information needed by the Department to conduct meaningful evaluations of the districts' plans. *Ibid.* The Commissioner "fully concur[red] that assessment of needs and evaluation of programs is central to any meaningful implementation of Abbott mandates...." Commissioner Decision at 81. Thus, he directed that

> to the extent that the Department may not be ensuring that assessments of student need are occurring or providing sufficient guidance as to how they are to be conducted ..., the Department shall ... recommend to the Commissioner such revisions to its practices and procedures as may be necessary....
>
> [*Id.* at 81–82.]

Subsequently, the DOE revised various budget forms and materials available at the Department's website, including a "Provider Budget Worksheet," an "Abbott Provider Budget Q & A," "Helpful Abbott Provider Budget Formulas," and "Abbott Provider Helpful Budget Worksheets." DOE, *Early Childhood Program Aid: Abbott School District: One–Year Operational Plan—School Year 2002–2003, at* http://www.state.nj.us/njded/ece/ecpa/ (*One–Year Operational Plan for 2002–03* ) (last visited on Dec. 31, 2001). Also, on December 17, 2001, the Department proposed amendments to *N.J.A.C.* 6A:24–3.4 that address, in part, evaluation and assessment of student needs in relation to funding determinations. 33 *N.J.R.* 4186, 4188. Particularly relevant is the provision stating that "[t]he [local] board[s] shall conduct evaluations and assess-

ments of the needs of their students, programs and community based providers so as to determine in detail their specific requirements and to formulate plans and applications geared to meet these needs." *N.J.A.C.* 6A:24–3.4(a)(7).

■ Active and ongoing regulatory guidance from the DOE is essential throughout this process. District budgetary requests must be developed and articulated with specificity, and, equally important, the DOE must respond with appropriate explanation. Formulaic decision-making neither assists the districts nor provides a basis for further review on appeal. Most important, we were informed at oral argument that the DOE has moved to a zero-based budgeting system. *See Advancing Implementation.* Thus, the DOE's instructions regarding Provider Budgets state,

> Districts should work with providers to ensure that costs are reasonable and appropriate and that sufficient justification for provider costs is incorporated into the district plan. Providers are asked to construct a zero-based budget reflecting the actual cost of delivering an early childhood education program meeting Abbott standards to Abbott children. There is no predetermined per pupil amount, as allocations shall be based on the unique needs of each provider and/or site.
>
> [*One-Year Operational Plan for 2002–03, Part V: Provider Budget Instructions and Forms: District Instructions.*]

Whatever nomenclature is used to describe the budget calculation, it *must* yield funding decisions based not on arbitrary, predetermined per-student amounts, but, rather, on a record containing funding allocations developed after a thorough assessment of actual needs.

### E. *Facilities*

In *Abbott V,* we held that the State's "constitutional educational obligation includes the provision of adequate school facilities." 153 *N.J.* at 519–20, 710 *A.*2d 450. We concluded that a thorough and efficient education in the Abbott districts requires the State to fund one-hundred percent of the costs for renovation of existing structures and construction of new facilities that will adequately accommodate Abbott district students. *Id.* at 524, 710 A.2d 450. We also recognized that temporary facilities would likely be needed in the interim and required the Commissioner to "make

use of trailers, rental space, or cooperative enterprises with the private sector" in order to timely meet the State's preschool obligations. *Id.* at 524, 710 A.2d 450. The Chief Judge likewise understood that the most "immediate" issue facing the Abbott districts in respect of school facilities is the provision of temporary facilities to accommodate the maximum enrollment of preschoolers during the period before permanent facilities are completed. OAL Initial Decision at 56. He recognized that disputes regarding temporary facilities are "inextricably tied to the individual needs of specific districts," *ibid.,* and the Commissioner confirmed that all such disputes would be decided on a case-by-case basis. Commissioner Decision at 82.

Plaintiffs generally claim, however, that "the DOE has failed to provide safe and adequate preschool facilities." OAL Initial Decision at 31. The Elizabeth Board of Education (Elizabeth) argued before the Chief Judge that the State's failure to provide funding, or at least to offer assurances that specific funding would later be approved, prevented the district from engaging in meaningful facilities planning for the 2000–01 school year and beyond. *Ibid.* Further, Elizabeth complained that it has been unable to engage in serious and effective recruiting efforts because it could not ensure that an adequate number of facilities would be available to accommodate all of the students who registered. *Ibid.* In representations to the Chief Judge and to this Court, Elizabeth stated that, due to a lack of facilities, it had a waiting list of between 250 and 300 three-year-olds; that the DOE had knowledge of the waiting list; and, that nonetheless Elizabeth was not designated to receive any temporary classroom units (modular units or TCUs) for the 2001–02 school year.

The Passaic Board of Education (Passaic), also, claims that its recruitment efforts have been hampered by the lack of either temporary or permanent facilities. Passaic alleges that over the past three years the DOE has either ignored or inadequately addressed the district's facilities needs. The district concedes that the Economic Development Authority ordered approximately fifty

TCUs for use in the 2001–02 school year,[8] but complains that the order came too late for the district to find and properly evaluate the sites upon which to place the trailers. We were informed at oral argument that certain sites initially selected later proved unusable because they were contaminated. These difficulties are likely to continue, according to Passaic, because of the lengthy lag-time between funding approval and the actual leasing, renovation or construction of preschool facilities. In essence, under the existing process, the district believes it unlikely that needed preschool facilities will be in place by the beginning of the 2002–03 school year.

The Perth Amboy Board of Education (Perth Amboy) alleges similar difficulties. Perth Amboy states that it first sought funding for a new early childhood learning center in May 1999 when it submitted its Long–Range Facilities Plan, but that, as of oral argument, funding had not been provided. The district leased a vacant parochial school building that provides twenty-one temporary classrooms, but even with this leased space, sixty-seven students remained on a waiting list. Perth Amboy anticipated placing those children in five new classrooms located in the Borough of Metuchen.

The DOE does not deny that the number of modular units available through the EDA contract was insufficient, or that several of the Abbott districts were unable to accommodate pre-school children who expected to enroll in full-day programs starting September 2001. Nonetheless, the State asserted at oral argument that all Abbott districts, with the exception of Elizabeth, would be in a position to serve all of the children who enrolled in

---

[8] The Educational Facilities Construction and Financing Act (EFCFA), L. 2000, c. 72, designates the Economic Development Authority (EDA), created by L. 1974, c. 80, as the agency responsible for the design, financing, planning, construction management, renovation, acquisition, and repair of school facilities. N.J.S.A. 18A:7G–13. In order to acquire modular units, the districts must first apply to the Commissioner for approval of a TCU facilities project. N.J.S.A. 18A:7G–5d. On approval, the EDA serves as the procuring agency for the districts. See N.J.S.A. 18A:7G–5i; N.J.S.A. 18A:7G–5s(4); N.J.S.A. 18A:7G–13a.

full-day, full-year programs within a few months. Once again, on the record before us, we are unable to determine the full extent of the facilities problem. *See* Initial Decision at 56 (noting that these issues should be reviewed on a case-by-case basis).

It is foreseeable, however, that districts conducting outreach initiatives will experience increased enrollments in the year following those efforts, and that some of those districts will not have sufficient classrooms for the children who enroll. To accommodate every child whose parents seek placement in an Abbott preschool program, Abbott districts anticipating increased enrollments should have in place a contingency facilities plan that has been reviewed and approved by the DOE. Those districts should identify specific facilities that can be renovated quickly if needed, or should seek DOE authorization for TCUs that can be obtained on short notice and appropriately situated on previously designated sites.

## III

### *The Relief Sought*

We observe, finally, that certain of the relief sought in this litigation has been provided by the Commissioner as a result of the administrative process. Yet, delays in decision-making, and even in respect of the relief so granted, have slowed the implementation of Abbott preschool programs. Adherence to the time frames established by the Court will result in timely determinations, as will cooperation and collaboration between the parties.

We are acutely aware of the constitutional imperative that undergirds the *Abbott* decisions, and of the vulnerability of our children in the face of Legislative and Executive Branch inaction. But we do not run school systems. Under our form of government, that task is left to those with the training and authority to do what needs to be done. Only when no other remedy remains should the courts consider the exercise of day-to-day control over the Abbott reform effort. That said, we must never forget that a

"thorough and efficient system of free public schools" is the promise of participation in the American dream. For a child growing up in the urban poverty of an Abbott district, that promise is the hope of the future.

As described in this opinion, plaintiffs' motion is granted in part and denied in part.

LaVECCHIA, J., concurring, in part and dissenting, in part.

This matter comes before us on a motion in aid of litigants' rights filed by the Education Law Center. The application was filed shortly after the issuance of an Initial Decision by the Acting Chief Administrative Law Judge of the Office of Administrative Law (OAL), concerning certain global issues affecting implementation of preschool programs for the thirty Abbott school districts. To permit the Commissioner an opportunity to review the Initial Decision and exceptions, and to issue a Final Decision, we allowed the State additional time to respond. The Commissioner's decision was issued June 1, 2001 and addressed criticisms of the State's implementation of its preschool program identified in the Initial Decision. The Commissioner also implemented certain reforms suggested by the Initial Decision. Thereafter, movants filed supplemental papers in support of their motion that included matters outside of those raised in the administrative hearing below.

*Amici* submissions also were received, including supplemental submissions to those that had already been filed with the Court. They also went beyond the record established at the OAL. The State filed a supplemental response.

Although none of the *amici* have been granted intervenor status, *amici* school districts, Passaic, Elizabeth and Perth Amboy, have included in their submissions numerous factual allegations pertaining to each district's particular ongoing controversy with the State concerning approval of a preschool plan and budget. Those factual allegations were challenged by the State in respect of their reliability and accuracy in portraying the implementation

of the preschool program in each district. In addition, we have *amici* applications from the New Jersey Education Association, the New Jersey Association of Children and an omnibus submission by Passaic County Legal Aid representing the National Association for the Advancement of Colored People, Head Start, and Early Childhood Program Organizations in two Abbott districts, Paterson and Newark. Again, many of these *amici* have included submissions containing untested factual information. In addition to its general disagreement concerning the reliability of the extensive supplemental information, the State opposed the submissions of the three school district *amici*, in particular, on the basis that each was litigating its own controversy before the Commissioner and should not be allowed to insert its individual dispute into this motion in aid of litigants' rights, and thereby skip the normal process of administrative hearing and appellate review. Moreover, the State maintained that the submissions were, at best, of marginal relevance in assisting the Court in determining whether the instant motion has merit.

For reasons that follow, the undisciplined state of this record renders it incapable, in my view, of supporting the extraordinary relief sought and I join in the majority's rejection of a Standing Master.

## A.

This is an application for litigants' rights pursuant to *Rule* 1:10–3. In my view, it was brought on a record that would not support the grant of a motion for summary judgment. If this Court were sitting as a trial court, the conflicted state of facts, including contradictory information and unreliable evidential submissions, would not satisfy the *Brill* standard for issuance of summary relief. *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.2d* 146 (1995). This sweeping application in aid of litigants' rights is even more inappropriate in that it was brought directly to this Court, which has not retained jurisdiction in the matter, and, indeed, has indicated that the parties are to employ recognized

avenues of administrative review. Moreover, and contrary to the dissent's view, this Court is not confronted with a clear defiance of its specific and unequivocal orders concerning how the State was to implement, in *minutia*, preschool programs in the Abbott districts. I find no such directives in *Abbott v. Burke* 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*), or in *Abbott v. Burke,* 163 *N.J.* 95, 748 *A.*2d 82 (2000) (*Abbott VI*).

Although fashioned as a motion in aid of litigants' rights, this application seeks above all else to wrest control of preschool implementation from the State and vest it in this Court through our appointment of a Standing Master acting as the Court's agent to supervise, and if necessary direct, the Department of Education's implementation of preschool in the Abbott districts. That extraordinary imbalance of the constitutional sharing of powers as between the executive, legislative, and judicial branches, is not warranted by the history of this matter. Moreover, it is unwise; this Court should not attempt to be a shadow administrator of education.

In *Abbott V,* the Court avoided suggesting that the provision of preschool to children in Abbott districts was a requirement rooted in our constitutional mandate for a thorough and efficient education. The Court's opinion recognized that empirical evidence supported the need for preschool, and that provision of preschool was linked to later success in school. *Abbott V, supra,* 153 *N.J.* at 503–04, 710 *A.*2d 450. The Court discussed the legislative choice to provide preschool, noting that the Legislature recognized its need and provided for early childhood education for three- and four-year-old children in the Abbott school districts. *Id.* at 505, 710 *A.*2d 450. The decision recognized that ECPA 2 districts (those districts with equal to or more than forty percent low-income pupils) would be provided with funding for preschool education pursuant to *N.J.S.A.* 18A:7f–16. Although that funding was a matter of legislative choice, Justice Handler, writing narrowly for the Court, construed the statute as suggesting that the need for preschool for three- and four-year-old children was as

compelling in ECPA 1 districts (those districts with equal to or greater than twenty percent but less then forty percent low-income pupils). *Abbott V, supra*, 153 *N.J.* at 506, 710 *A.*2d 450. Therefore, the Court read the statute to require provision of preschool education to three- and four-year-old children in both types of districts. *Id.* at 506–07, 710 *A.*2d 450. Significantly, the Court did not require full-day programs. The Court instructed the Commissioner to proceed to implement half-day preschool programs for three- and four-year-old children in ECPA–1 and –2 districts. *Id.* at 507–08, 710 *A.*2d 450. That included all thirty Abbott school districts. The Court expressly declined to reach the question whether there was a constitutional requirement for such preschool. *Id.* at 507, 710 *A.*2d 450.

Thereafter, it was the executive and legislative choice to implement preschool programs even more expansively than the Court had required. Through enactment of *N.J.A.C.* 6A:24–3.3, the Commissioner determined to implement full-day preschool for both three- and four-year-old children in Abbott districts. And, the Legislature has funded those programs.

Importantly, *Abbott V* signaled the Court's announcement of its desire to end its involvement in this long-lasting dispute concerning school funding. *Supra*, 153 *N.J.* at 490, 710 *A.*2d 450. *Robinson v. Cahill*, 62 *N.J.* 473, 303 *A.*2d 273 (1973), arose in the early 1970's and played a pivotal role in securing legislative passage of an income tax. Richard Lehne, *The Quest For Justice: The Politics of School Finance Reform* 26–57 (1978). Yet the dispute over adequate funding for the constitutional imperative of a thorough and efficient system of public education lingered and did not end until the Court finally required educational funding parity, ordering the State to pay for the per-pupil funding difference between the poorest districts and the richest. *Abbott v. Burke*, 149 *N.J.* 145, 189, 693 *A.*2d 417 (1997) (*Abbott IV*). The Court also embraced the State's choice of curriculum and attendant educational reform in the poorest districts. *Abbott V, supra*, 153 *N.J.* at 500–02, 710 *A.*2d 450. One of the tools the State elected to

include was preschool and, as noted, that tool was relied upon in *Abbott V* as the predicate for relief. *Id.* at 508, 710 *A.2d* 450.

Today, I join in that aspect of the Court's disposition that denies the appointment of a Standing Master, a decision that is consistent with the Court's promise to stay out of ongoing implementation of essentially educational issues while the State pursues radical reform of K–12 education in New Jersey's thirty Abbott districts, including preschool programs. The State has embarked on its first-ever student recruitment and delivery of preschool education to the entire eligible three- and four-year-old student population in Abbott districts. From 1998 to the 2000–01 school year, the State has dramatically increased preschool enrollment, as the majority notes. During that short period, the State has assisted in or delivered facility solutions to house those programs, and has developed a framework for a curriculum, a budget review process (that at the time of oral argument was evolving to become "district friendly"), a certification standard, a method for discerning the population of eligible preschool students and for enrollment targets, and implemented the lowest teacher-pupil ratio for this population of students than for any other non-special education pupil population in the State. Much has been done, it is true; no one disputes that there is more to do.

This application for a Standing Master seeks to involve the Court in the details and *minutia* of a comprehensive and multi-faceted education reform effort that the State has in progress. The State has substantially complied with every aspect of the Court's direction concerning preschool education for Abbott districts, however generally discussed in prior opinions. Movant's argument for a Standing Master is based on the Court's exhortation to the State for a "high quality" preschool program, a descriptor used by the State itself in setting its own goal for its ambitious preschool program. But that generalized statement in the Court's prior opinions does not mean that every difference of opinion between movant and the State as to what is "high quality," merits review by this Court as a violation of the Court's expecta-

tions. The reference to "high quality," in my view, provides substantial discretion to the State and does not give rise to a violation meriting a motion in aid of litigants' rights whenever movant is disappointed with an implementation choice by the State. It certainly should not support an order for a Standing Master divesting a cabinet officer from executing his constitutional responsibilities to execute the laws within the range of discretion allocated to the office.

I see no basis in this record for the appointment of a Standing Master. Such an extraordinary step should require a compelling demonstration of failure or refusal to perform specific tasks ordered to be done. That is not present here. The reference in our earlier Court opinions to "high quality" preschool provides no such touchstone on which to base a compelling demonstration that a directive of this Court has been violated by the State.

### B.

The abysmal softness of the "record" before us makes it a poor vehicle for the Court to wade into more and more specific direction to the State concerning how to implement a preschool program. Indeed, concerning substantive educational standards, enrollment, and recruitment, the majority orders the Commissioner to do that which he already has said that he would do. The Court did not need to grant aid in litigants' rights on those points.

The balance of the Court's opinion passes judgment on asserted facts in which I have no confidence, except one. The State readily acknowledged the lateness of its final determinations concerning approval of certain districts' preschool plans and budgets. That matter, therefore, appropriately may be judged. The State explained its delay, in part, as due to its efforts to come to amicable resolutions when possible, or to allow a district more time to support its plan or budget request. The majority correctly perceived that the result of those delays, even if one were to agree that they were well-intentioned, was effectively to preclude a meaningful opportunity to challenge the Department of Edu-

cation's individual decisions before the OAL and later through judicial review. The Court's clarification of its previous order, setting a time frame for decision and shortening the administrative hearing and judicial review process, was necessary to reestablish that opportunity for ensuing school years.

## C.

Finally, I add the following comment concerning my understanding of the Court's discussion of funding assessment. I understand the Court's characterization to admit that although a funding assessment is to be conducted in accordance with a fair evaluation of actual need as the Department represents, that does not mean that preschool funding must be provided at the level of actual need. Funding may be provided as a percentage of that need, based on that which the State determines it is able to appropriate. I write separately to highlight that understanding of the majority's judgment.

The Court's and the dissent's discussion of community providers, and Head Start specifically, also compels me to comment. The dissent seems to be of the view that Head Start must be subsidized so it can provide preschool even if the combination of Head Start funding and State funding would be more than the State would expend to provide preschool services of equal quality. The majority seems to support at least part of that view when it suggests that the State "must" subsidize Head Start teachers' salaries. Both opinions miss the point that the public is entitled to the provision of quality services on the most economical of terms. If a provider such as Head Start cannot maintain the required level of preschool program at or below the State's expenditure level for the provision of quality preschool, then it should not demand a contract at greater cost to the State. The answer for Head Start lies not in excessive public funding, but in achieving efficiencies. Accordingly, I write to emphasize my view that the requirement of a "needs assessment" for community providers does not mean that the State must insist that a district reach

financial agreement with community providers "at any cost." Those providers have a responsibility to come forward with thoughtful, economically responsible proposals that serve the public interest.

For the reasons expressed, I respectfully concur in part and dissent in part from the judgment of the Court.

STEIN, J., dissenting.

In its October 22, 2001 Order in this proceeding establishing a timetable for appeals of preschool program and budget decisions, the Court, by a 4–1 vote, declined to appoint a Special Master to resolve Abbott preschool disputes. *Abbott v. Burke*, No. M–1131 at 3 (N.J. Oct.22, 2001) (October Order). That determination was made prior to the gubernatorial election and substantially in advance of any notice from the parties concerning the prospect of cooperation between the Education Law Center (ELC) and the incoming administration.

Confirmation that such cooperation has begun and is continuing is one of the most positive developments in the long history of this litigation. If successful, that cooperation may significantly diminish the need for an efficient and effective procedure to resolve disputes. Nevertheless, the commencement of that cooperation in December 2001 and its continuation to date does not relieve the Court of its responsibility to decide—in its October Order and in this opinion—whether *based on the record* before it the ELC's request for appointment of a Special Master should be granted. In my view the Court errs now, as it did in October, in declining the ELC's request.

I

If we were writing on a clean slate, the Court's failure to appoint a Special Master to hear and resolve all disputes arising in connection with implementation of preschool in the Abbott districts might be understandable. Even though this is the second time since our 1998 Order mandating preschool for *all* eligible

three- and four-year olds in Abbott districts that the Court is required to intervene and significantly modify the State's implementation of our Order, a fair-minded observer might assume, absent any other history, that the State deserves one more chance to comply on its own.

But the slate is not clean. This proceeding marks the fifteenth occasion in less than thirty years that the advocates of equal educational opportunity for poor urban school children have come to this Court to seek judicial relief from inadequate funding, deficient substantive educational programs and substandard facilities. A concise summary of the history of the *Robinson v. Cahill* and *Abbott v. Burke* school litigation through 1998 is set forth in *Abbott v. Burke*, 153 *N.J.* 480, 490–93, 710 *A.*2d 450 (1998) (*Abbott V*). That summary reveals that in the course of this thirty-year old litigation four state statutes providing for state funding of public education have been held by this Court to be unconstitutional as applied to the poorest urban school districts: The State School Incentive Equalization Aid Law (L.1970 c. 234); The Public School Education Act of 1975 (L.1975, c. 212); The Quality Education Act of 1990 (L.1990, C. 52); The Comprehensive Educational Improvement and Financing Act (CEIFA) (L.1996, c. 1389). Each one of those statutes, enacted by the Legislature and signed by the then Governor, was found to be flawed by this Court because of a failure to provide a level of funding "adequate to provide for the special educational needs of these poorer urban districts, and address their extreme disadvantages." *Abbott v. Burke*, 119 *N.J.* 287, 385, 575 *A.*2d 359 (1990) (*Abbott II*).

That summary of the history of New Jersey's urban public school litigation also reveals an unmistakable pattern of defiance by several Commissioners of Education of directives issued by this Court and by the Legislature, requiring the Department of Education (Department or DOE) to determine what special programs and services were necessary to enable schoolchildren in poor urban districts to achieve educational success. See *Abbott II, supra*, 119 *N.J.* at 294, 374, 386, 575 *A.*2d 359; *Abbott v. Burke*,

136 *N.J.* 444, 453, 643 *A.2d* 575 (1994) (*Abbott III*) ("Moreover, although legislation was enacted specifically to require the Commissioner, in accordance with our holding in *Abbott*, to undertake a study of the programs and services to be implemented for disadvantaged students, including their costs ... *L.* 1991, *c.* 259, § 2, that study apparently has not been completed.").

That pattern of noncompliance was perpetuated in CEIFA, passed by the Legislature in 1996. In *Abbott v. Burke*, 149 *N.J.* 145, 693 *A.2d* 417 (1997) (*Abbott IV*), we held unconstitutional as applied to the *Abbott* districts the two supplemental aid programs authorized by CEIFA, Demonstrably Effective Program Aid (DEPA), *N.J.S.A.* 18A:7F–18 (providing $300 to $425 per pupil), and Early Childhood Program Aid (ECPA), *N.J.S.A.* 18A:7F–16 (providing $465 to $750 per pupil), because the State failed to demonstrate that the per-pupil funding amounts were sufficient to meet the students' actual needs. We stated:

> The State contends that experts were involved in formulating the amounts of DEPA and ECPA and that the Court should defer to their determinations. Children in the special needs districts have been waiting more than two decades for a constitutionally sufficient educational opportunity. We are unwilling, therefore, to accede to putative expert opinion that does not disclose the reasons or bases for its conclusions. We have ordered the State to study the special educational needs of students in the SNDs. That has not been done. We also have ordered the State to determine the costs associated with implementing the needed programs. Those studies have not occurred. Without studies of actual needs, it is unclear how a sound program providing for those needs has been accomplished.
>
> The State has failed to demonstrate a basis for the per-pupil amounts for supplemental programs, and we thus cannot accept the proposition that the DEPA and ECPA per-pupil amounts will enable the SNDs to implement preschool, full-day kindergarten, and other constitutionally required programs.
>
> [*Abbott IV, supra,* 149 *N.J.* at 185–86, 693 *A.2d* 417.]

That incontestable thirty-year record of legislative and executive branch unwillingness to address the deficiencies in urban education frames the issues presently before the Court. No one who has served in the executive or legislative branches during these past three decades could dispute the fact that legislatures dominated by suburban legislators often have impeded efforts by advocates of urban education to improve funding, programs, and

facilities in urban schools. Finally, after almost five decades of neglect of urban school systems that once were among this State's premier public school programs, the State, by order of this Court, is providing funding to urban schools comparable to that expended by the wealthiest suburban communities, and equally important, is in the process of implementing preschool for three- and four-year olds, full day kindergarten, and whole school reform. With adequate funding and successful implementation of high-quality preschool and kindergarten programs, the poorest urban districts, after decades of neglect, finally will have the basic tools necessary to deliver a "thorough and efficient" education to their students. Although in *Abbott V* we did not squarely rest the State's obligation to provide preschool to poor urban children on the Constitutional imperative of a thorough and efficient education, we left no room for doubt about the irrefutable connection: "[B]ecause the absence of such early educational intervention deleteriously undermines educational performance once the child enters public school, the provision of preschool education also has strong constitutional underpinning." *Abbott V, supra,* 153 *N.J.* at 507, 710 *A.*2d 450.

Sadly, the record now before us informs us that the historic pattern of delay and neglect persists, this time in the flawed implementation of the preschool programs ordered by this Court in 1998. In the Office of Administrative Law proceeding before Chief Judge Masin, the parties disputed whether enrollment was at forty-seven percent of eligible students as certified by Dr. Barnett, or slightly in excess of fifty percent as claimed by the Department. In either case, progress in implementing preschool is unacceptably slow. In *Abbott IV* we observed that "[d]elaying implementation [of preschool] until 2001" constitutes "a glaring weakness" in CEIFA because that delay "means that four more classes of disadvantaged children will miss out on programs virtually essential to future educational success." 149 *N.J.* at 183–84, 693 *A.*2d 417. If in 1997 we considered delaying preschool until 2001 to be "a glaring weakness," then the continued delay

revealed by this record in providing preschool for the thousands of unserved children is even less tolerable today.

The administrative appeal process retained by the Court's opinion, *ante* at 541–45, 790 *A*.2d at 845–47, is poorly designed to address and resolve expeditiously the kinds of disputes that have arisen and that will continue to obstruct preschool implementation. The Court's opinion concedes, as it must, *ante* at 543, 790 *A*.2d at 846, that "on the question of timely disposition, the record is dismal." The processes of the Office of Administrative Law and the Commissioner, although appropriate in routine contested matters, are not well suited for managing, mediating, and expeditiously resolving the variety and scale of controversies that are impeding an effective pre-school program. A Special Master, broadly empowered by the Court, would contribute expertise, objectivity, speed and pragmatism to the dispute resolution process.

Without a Special Master, resolution of the recurring disputes affecting implementation of preschool may continue to frustrate and obstruct achievement of this essential program for thousands of eligible but unserved children. The recent expression of anticipated cooperation between the ELC and the incoming administration is a most encouraging development in the thirty-year-old struggle for educational adequacy in our urban districts, but even a cooperative effort does not assure that disputes will be efficiently and fully resolved. Instead of asserting its historic institutional role by designating a Special Master to monitor and resolve disputes quickly and effectively, the Court passively allows further obstruction and delay by remitting the parties to an adjudicative process that has failed during the past three years and will not work in the future.

II

A review of the issues before the Court on this appeal underscores the breadth and difficulty of the disputes that presently

impede full implementation of preschool. I address those issues in the approximate order of their complexity.

### A. *Facilities*

The Court allocates a few pages of its opinion to the issue of preschool facilities, *ante* at 559–62, 790 *A.*2d at 856–57, but its discussion of the issue does not explain or attempt to address the extreme frustration that some districts have experienced because of the State's apparent mishandling of districts' facilities needs. The Department itself recognizes, according to the certification of Assistant Commissioner Fairweather, dated June 19, 2001, that "the biggest obstacle to meeting the State's goal of providing a full-day, full-year preschool program to all eligible students in the 2001–2002 school year is the lack of available facilities in some of the Abbott districts." Excerpts from certifications filed by the Presidents of the Passaic and Elizabeth Boards of Education explain the seriousness of facilities problems encountered by some districts.

Nancy Everett, President of the Passaic Board of Education, a District with a waiting list as of September 20, 2001 of 775 children because of insufficient facilities, stated as follows:

> The Passaic Board of Education has, since the *Abbott V* decision in 1998, sought funding in every school year for a high quality pre-school program in adequate facilities for all three and four year olds in Passaic.
>
> I submit this Certification to inform the Court of the sense of considerable frustration the Passaic Board has experienced over the past three years because of the Department of Education's repeated failure to provide this District with the funding and facilities necessary to provide the pre-school program needed by our three and four year olds.
>
> The Board members are the ones who are in the front lines of Abbott pre-school implementation, and we are the ones who receive calls from parents who do not understand why their children have been placed on a waiting list rather than in a pre-school educational program. Although we try to explain to the parents that the District's inability to provide the needed program is a result of inadequate State funding and the Department's unresponsiveness to our request for facilities, these parents feel deceived by the Passaic Board even though we have no control over the Department's actions.
>
> Many parents do not even believe that a pre-school program exists in Passaic because their children have never been able to participate in it. Others feel totally discouraged by the lack of any program for their children and have lost confidence

in the Board and our public school system. They question why they should even bother registering for a program that is seemingly non-existent for large numbers of children. This is very troubling for the Board members, who seek to improve and inspire confidence in our public education system and to draw more students for longer period of time into our public schools.

. . .

This Board further believes that thousands of eligible three and four year olds [ ] have already lost the opportunity for Abbott quality pre-school programs in this District. Any further delay in full implementation of this Court's decisions will result in future generations of pre-schoolers being deprived of the pre-school education they clearly need to make them ready to enter our public schools.

The Board does not feel that temporary classroom units, or trailers, are an appropriate educational facility. However, we have felt compelled to accept them because the Department has left us with no alternative due to its failure to provide adequate funding for suitable pre-school facilities in Passaic.

**Jim Ford, President of the Elizabeth Board of Education, whose preschool waiting list was 966 children on September 17, 2001, certified:**

The Elizabeth Board of Education was so frustrated by the Department of Education's failure to provide the District with needed pre-school facilities that we decided on our own in July 2000 to fund through our local taxpayers the lease and renovation of a former Rickels site for use as a pre-school facility.

. . . .

This project is one of many that the District could have [ ] undertaken and completed by the commencement of the 2001–02 school year if we had received adequate funding and support from the Department of Education in response to our repeated requests from 1998 until now. Unfortunately, we did not receive the requested approval or funding for adequate temporary and permanent facilities and, as a result, we opened the 2001–02 school year without adequate spaces to provide pre-school for all three and four year olds in the District. *In fact, as of September 17, 2001, the District has a waiting list of 966 pre-school age children.*

. . . .

. . . [T]he Elizabeth Board of Education acknowledged in the Fall of 2000 that the District would be willing to site trailers in the District for the 2001–02 school year. We did so reluctantly because of our serious concerns about the impact on the school district of the siting on school property or in the City of the large number of trailers that would be needed to provide classroom space for all eligible pre-schoolers.

Our willingness to do so was based on the understanding that the State would provide the District with the needed number of trailers to house all eligible preschoolers and that those trailers would be installed and ready for occupancy by September 2001.

In late July 2001, the District was advised by the Department of Education and the Economic Development Authority that the State could not assure us that the

District would receive more than 52 trailers, or temporary classroom units ("TCUs") as the State now calls them, even though we had indicated that the District needed over 150 TCUs to provide classroom spaces for all eligible three and four year olds. In addition, we were advised that the 52 TCUs allotted to the District would not be ready for occupancy until November 2001, at the earliest, even though we had been repeatedly assured until then that the TCUs would be ready by September 1, 2001.

While the State currently anticipates that those TCUs could be completed and occupied by November 1, 2001, we have no reason to believe, based on our own experience and the experience of other Abbott districts, that those commitments will be fulfilled.

The State has also failed during the past several months to address any of the critical health and safety facilities projects in the District that the State promised to undertake during this past summer. As a result, these projects, if they are even undertaken at this point, could disrupt ongoing educational activities in the District during the school year.

. . . .

For the past several years, the Elizabeth Board of Education has sought to address the needs of our disadvantaged children in accordance with our understanding of this Court's mandates in the Abbott v. Burke decisions. However, we have been totally frustrated because the Department of Education and the Economic Development Authority have been unresponsive to our requests or have outright refused to take the necessary immediate action, besides the belated and inadequate number of TCUs, to provide the District with critically-needed temporary and permanent pre-school facilities.

Although the boards of education in the Abbott districts are completely at the mercy of the Department in implementing the Abbott pre-school mandates, we are the ones who must face public anger when children have been placed on a waiting list, as we have had to do in Elizabeth, rather than in a pre-school educational program. Although we try to explain to the parents that the District's inability to provide the needed program is a result of inadequate State funding and the Department's unresponsiveness to our request for facilities, these parents feel deceived by the Elizabeth Board of Education and the District even though we have no control over the Department's inaction and unresponsiveness.

Unless the Court grants immediate relief, *including ensuring regular judicial supervision of the State's future implementation of pre-school,* the Elizabeth Board of Education believes there is no reasonable likelihood that the State will undertake expedited construction of temporary and permanent pre-school facilities; there is no reasonable likelihood that the State will commence needed health and safety projects in the near future; and there is no reasonable likelihood that this District will be able to provide well-planned, high quality pre-school for all eligible three and four year olds in this school year or at any time in the foreseeable future. (Emphasis added.)

In *Abbott V, supra,* decided by this Court on May 21, 1998, we directed the Department to provide funding to any District that

had adequate facilities and staff to begin preschool in September 1998 and ordered the Department to ensure that all Abbott districts had the "resources and additional funds that are necessary to implement pre-school education by the commencement of the 1992–2000 school year." 153 *N.J.* at 508, 710 *A.*2d 450. Recognizing the obstacles posed by the need for more classroom space, we directed the Commissioner, "[w]hile awaiting construction or renovation of the necessary facilities," to "make use of trailers, rental space, or cooperative enterprises with the private sector." *Id.* at 524, 710 *A.*2d 450. We noted that "[t]he State has indicated that it is prepared to move immediately to ensure the availability of adequate temporary facilities to implement pre-school ... in all Abbott schools by the beginning of the 1999–2000 school year." *Id.* at 524–25, 710 *A.*2d 450.

Fairly read, this record indicates that the Department has neither provided nor funded *any* additional preschool facilities for the 1999–2000 or 2000–2001 school years, a failure described as "regrettable" by Acting Chief Judge Masin. See *In re: Abbott Global Issues No. EDU 3246–01,* 2001 at 55 (OAL Initial Decision). *See also* Letter, March 22, 2001, Education Law Center to Attorney General John Farmer ("[T]hree years since *Abbott V* and one year after *Abbott VI,* the DOE has yet to provide the Abbott districts with *any* temporary or permanent pre-school facilities.")

The record contains no explanation for the Department of Education's inaction concerning provision of temporary facilities for the past two school years other than the fact that the Legislature on July 18, 2000 enacted the Educational Facilities Construction and Financing Act (EFCFA), *N.J.S.A.* 18A:7G–1 to –44, pursuant to which all Abbott district "school facilities project[s]," including construction of either district or community provider preschool facilities, *N.J.S.A.* 18A:7G–3, are to be constructed and financed by the New Jersey Economic Development Authority. *N.J.S.A.* 18A:7G–5. Perhaps the pending enactment of the EFCFA, the Department's initial failure to adhere to the fifteen child class size limits for preschool, see *Abbott v. Burke,* 163 *N.J.*

95, 112–14, 748 *A*.2d 82 (2000) *Abbott VI,* and the September 2001 deadline for full-day preschool for all Abbott three- and four-year olds contributed to the Department of Education's delay in addressing facilities needs. But this record demonstrates clearly and convincingly, with virtually no contest by the State, that the Department's neglect of the Abbott facilities problem materially has hindered full availability of preschool.

Certifications in this record by Abbott district superintendents graphically describe the effect on preschool enrollment of the Department of Education's neglect of and inattention to facilities needs. Dr. Robert Holster, the Passaic Superintendent, certified on December 22, 2000:

> Since February 1999, the District has advised the Department of the District's critical need for additional pre-school facilities to provide spaces for all eligible three and four year olds in pre-school educational programs sought by the District to meet the needs of our pre-school population. The District also advised the Department that the District would not be able to serve all eligible three and four year olds without programmatic approval and sufficient funding for additional facilities. The District repeatedly emphasized the compelling need for the Department to act immediately on the District's pre-school facilities needs or else the District would not have adequate facilities in place to provide spaces for all of the District's eligible three and four year olds in 1999–2000, 2000–2001, or in any subsequent school year.
>
> . . . .
>
> As a result of the lack of approval of, and funding for, adequate pre-school facilities, the District has been unable to offer a pre-school education program for all eligible three and four year olds in the District. The District presently does not know when, if ever, it will be provided with the necessary funding for facilities to serve all eligible pre-schoolers.
>
> . . . .
>
> As a result of the lack of available space in community providers and the failure of the Department to take timely steps to provide funding to address the lack of adequate pre-school facilities in the District, the District, during the 2000–2001 school year, has only been able to serve approximately 403 of the 1231 eligible three year olds (or about 33%) and 584 of the 1231 eligible four year olds (or about 47%). Because of the lack of funding for adequate pre-school facilities, despite the Department's awareness of this District's need for such facilities since February 1999, the District has not been able to provide pre-school educational programs for all eligible three and four year olds in the District, as required by the *Abbott VI* decision.

Similarly, on June 12, 2001, Dr. Holster certified:

For the 2001–02 school year, the District has sought to implement full-day, full year pre-school for three and four year olds. However, as I explain in this Certification, I have been unable to engage in aggressive recruitment and outreach to enroll all eligible three and four year olds because the District does not have adequate permanent and temporary classrooms at the present time—in district-operated and community provider programs—and I seriously doubt whether the District will have adequate facilities in place by the beginning of the 2001–02 school year.

. . . .

In our plans and correspondence, the District has repeatedly emphasized the compelling need for the DOE to act immediately on the district's pre-school facilities needs or else the District would not have adequate facilities in place to provide pre-school programs for all eligible three and four year olds.

Throughout the past three years, the DOE either ignored or inadequately addressed our critical need for additional temporary and permanent facilities. As a result, the District was not able to undertake the lease, purchase or renovation of several additional sites identified by the District for its pre-school program over the past few years.

. . . .

It has been our experience that there is a gap of [ ] eight to twelve months between the time the District received approval and funding for pre-school facilities and the time those facilities can be leased and renovated, or constructed, for pre-school classrooms. Therefore, at the present time, the Passaic School District will most likely not have any permanent pre-school facilities in place for the 2001–02 school year and, unless the DOE and EDA expedite the construction process, we are not likely to have any permanent pre-school facilities in place by the beginning of the 2002–03 school year. *Also, if we elect to challenge the DOE's decisions in the administrative process, the DOE effectively drags these proceedings out so far into the school year that, by the time we either settle or succeed, it's too late in the school year to actually implement the program we were able to secure through the appeal. The current delays in decision making and the appeals process are a serious hurdle for the District to overcome in making sure we secure what our children need.*

Although the EDA has advised the District in April 2001 that it ordered 88 temporary classroom units ("TCUs"), or trailers, as temporary facilities for pre-school during the 2001–02 school year, the District has no idea at the present time when these TCUs will actually be delivered or whether they will be in place by September 2001. In addition, the District has been unable to locate available space in Passaic for more than approximately 50 of the trailers the EDA has ordered for the District. The DOE's and the EDA's belated actions to provide some temporary facilities for the 2001–02 school year has left us with little time to figure out where to place trailers in Passaic's limited vacant lots.

As a result of the DOE's failure to approve and fund adequate pre-school facilities, the District will *not* be able to offer a full day, full year pre-school program for all eligible three and four year olds in Passaic. *In fact, I currently believe that the District might have to turn away more than 1,000 preschoolers this*

*fall, because of the delays and failures in DOE's implementation of this Court's pre-school requirements in Passaic.*

On June 14, 2001, in a supplemental certification, Dr. Holster observes that in its June 12, 2000 decision approving Passaic's operational plan for preschool and kindergarten for 2001–02, the DOE erroneously determined that over 1000 preschool and kindergarten children were to be served at facilities in Passaic that either did not exist or had not been authorized:

I am more convinced than ever, after receiving the DOE's decision that the District is facing a serious crisis this school year and that this District will be unable to provide pre-school education for hundreds, if not thousands, of eligible three and four year olds. I am also not able to understand how the DOE could have issued such a decision, because significant statements in the DOE decision are directly contrary to information we have submitted to the DOE.

The most glaring examples of the problems with the DOE decision are found in statements relating to: (1) pre-school classrooms at Schools # 3, # 6, and # 7 for 375 three year olds and for 465 four year olds (DOE decision at 2 and 7); and (2) seven TCU classrooms at St. Mary's for approximately 105 children (DOE decision 3)(The Department had previously advised the District that 9 TCUs would be sited there.) The Doe decision also states that a substantial number of kindergarten children will be served in 2001–02 at a facility on Henry St. (DOE decision at 11).

We have sought for approximately two years to obtain DOE approval for additions at Schools # 3, # 6, and # 7 for pre-school classrooms. The DOE only recently approved the District's request and the entire project is in the early post-approval stage. Construction has not even commenced, and there is no possibility that these additions will be in place by September 2001. In fact, at the rate the DOE and EDA are proceeding on these additions, it is very likely that they will not even be ready for the 2002–03 school year. *Therefore, the DOE decision approved spaces that don't presently exist (and will not likely exist in the next year), and there is no other capacity in district-operated or community provider programs to serve the 840 three and four year olds projected by the DOE decision for Schools # 3, # 6, and # 7.*

For approximately one year, the District has also unsuccessfully sought approval from the Department to lease and renovate classroom facilities at St. Mary's to serve as temporary facilities for pre-school classrooms. Despite our best efforts, the DOE failed to act on this request.

. . . .

Not only did the District lose the opportunity to obtain those additional pre-school classrooms as a result of the Department's unresponsiveness and delays, but also the District has no assurance at the present time that it will be able to use the St. Mary's site for the 7(or 9) TCUs projected by the DOE decision to be placed there. *Consequently, the DOE decision approves classroom spaces at St. Mary's that don't exist, and there may not be space available to the District to site the TCUs for the 2001–02 school year. There is no other capacity in district-operated*

*or community provider programs to serve the 105 preschoolers projected by the DOE decision for St. Mary's.*

Although not directly relevant to the pre-school issues before the Court, it is worthy of note that the DOE decision also approves kindergarten classes at Henry St. when classrooms at that property are not likely to be available to the District by September 2001. For approximately two years, we have unsuccessfully sought funding to enter into a lease agreement to renovate the Henry St. site for temporary pre-school and kindergarten classrooms. In December 2000, the District was advised by the Department that the Economic Development Authority ("EDA") would take over the negotiations for the lease of the Henry St. property. I have recently been advised by the Department that the matter has been forwarded to the EDA for land acquisition, but I do not know when, if at all, that property will be acquired. *Therefore, it is impossible to have that facility ready for any students, either kindergarten or pre-school, by September 2001 or at any time in the 2001–02 school year.*

It is most troubling to me that the Department failed to take timely action on our repeated requests over the past two years for the above permanent and temporary facilities for pre-school classrooms. *Yet, the Department has issued a decision that relies on the placement of children in classrooms in these same facilities that do not now exist and are not likely to exist in the near future.*

The DOE decision creates the illusion that this District will be able to operate a pre-school education program in 2001–02 for large numbers of three and four year olds. The truth is that because the department has not provided the necessary approval of, or adequate funding for, facilities over the past few years, the Passaic School District will have a substantial number of preschoolers on a waiting list or denied programs altogether during the 2001–02 school year.

[ (Emphasis added).]

On September 20, 2001, in Dr. Holster's second supplemental certification, he observes that because of Passaic's waiting list of 775 children and the non-delivery of temporary classroom units, Passaic was forced to seek a waiver that would defer full day preschool for that number of three year olds that Passaic lacked capacity to serve. He stated:

The District currently has a waiting list of 775 three and four year olds because of the lack of adequate temporary and permanent pre-school facilities in the District. My staff also believes there are countless others whose parents were forced to seek alternative arrangements for their three and four year olds after it became obvious that the District did not have adequate facilities to provide pre-school for all eligible three and four year olds this school year.

. . . .

The only measures to provide additional temporary facilities for the District's pre-school program during the 2001–02 school year have been connected with the Department's and the Economic Development Authority's ("EDA") plan to provide

temporary classroom units ("TCUs") for the District. The District was initially provided with a schedule by the EDA indicating that any needed TCUs would be installed and ready for occupancy by September 1, 2001. . . .

Although the District advised the Department and the EDA that it would need approximately 88 TCUs by the beginning of the 2001–02 school year, we have only been provided with 15 TCUs to date. These TCUs are still under construction and are not yet ready for occupancy. We are hopeful that these 15 TCUs will be ready for occupancy within the next few weeks.

As a result of various developments over the past few weeks relating to the TCUs, the District currently does not know the definite time line for the delivery of additional TCUs to the District or the number of additional TCUs that will be available for the 2001–02 school year. This has placed in doubt our ability to implement the schedule in our contingency plan for the 2001–02 school year, which I discuss below and which was submitted at a time when we understood that the remaining TCUs would be delivered and installed within the next few months.

. . . .

In light of the evident problems facing the District in August 2001, when it became obvious that the EDA would not have the needed TCUs delivered and installed by the promised date, the District engaged in discussions with the Department about a contingency plan to address the pre-school facilities shortage during the 2001–02 school year. . . .

. . . .

On August 31, 2001, the District's contingency plan was approved by the Commissioner of Education. The Department quite correctly notes in the attachments to the August 31 letter that there is a shortage of facilities for the 2001–02 school year and that, as a result, hundreds of children would be unhoused. However, the Department fails to address the fact that the District had advised the Department for years of the critical need for pre-school facilities. Nor does the Department acknowledge that the current unfortunate situation is a direct result of the Department's repeated failure, as discussed in this Second Supplemental Certification, and the other certifications I have submitted to the Court, to respond in a timely or appropriate fashion to the District's numerous specific pre-school facilities proposals over the past three years.

Significantly, the Department has neither denied nor responded to Dr. Holster's allegations.

Complaints similar to those expressed by Dr. Holster are contained in certifications submitted by the Superintendents of the Elizabeth and Perth Amboy districts. Although the details are different, those certifications also demonstrate with graphic specificity that the DOE has seriously neglected the facilities needs in those districts. Elizabeth also has been granted a waiver of its

obligation to provide full day preschool to all eligible three- and four-year olds because of a lack of facilities.

As did Chief Judge Masin, OAL Initial Decision at 56, the Court's opinion anticipates that future disputes concerning facilities will be resolved through the administrative hearing process on a case by case basis. *Ante* at 560, 790 *A*.2d at 856. As the record demonstrates, facilities issues require expeditious resolution so that districts know their capacity and can plan enrollment based on capacity. The Court's October Order, *ante* at 541, 790 *A*.2d at 845, provides an expedited review process only for budget and program issues, but does not and cannot accommodate review of facilities disputes because of their unpredictability. A Special Master with broad authority obviously would facilitate prompt resolution of such disputes. As is apparent from the frustration expressed by Board Presidents and Superintendents in this record, the State's interest in implementing preschool effectively is not well served by the misunderstandings generated by lingering and unresolved disputes over facilities needs. A Special Master, possessing a firm grasp of the issues and the authority both to mediate and adjudicate individual district complaints, would far better serve the needs and interests of both the districts and the Department than would the flawed and dilatory administrative review process designated by the Court.

## B. *Head Start*

The Department's refusal to allow the districts to enter into contracts with and provide funding for Head Start centers servicing in excess of 8000 preschool age children in Abbott districts is bewildering and inexplicable. In *Abbott VI, supra,* the Court was informed that the State was excluding Head Start children from the mandatory Abbott preschool program. The Court specifically held that Head Start children could not be excluded from preschool unless the Head Start programs themselves were equivalent to DOE preschool standards, a condition that none of the Head Start programs met at that time. 163 *N.J.* at 116–17, 748 *A*.2d 82. Today, the Court again orders the State to include

children attending federally funded Head Start centers in the *Abbott* preschool program "unless the cost of doing so is demonstrably more expensive than other high-quality alternatives," *ante* at 555, 790 *A*.2d at 583, but the Court again provides no mechanism for a remedy if the State persists in its incomprehensible refusal to negotiate adequate funding for these Head Start children.

The relevant facts concerning Head Start are much easier to understand than is the DOE's decision to deny funding to the Head Start programs. Head Start centers provide early childhood services for approximately 14,500 predominantly minority three- and four-year olds in forty New Jersey municipalities. Head Start programs service all thirty Abbott districts and *include over 8000 children in those districts*, or *approximately fifteen percent of the total number of children eligible for preschool in Abbott Districts, according to the DOE's calculations*.

Federal funding for Head Start serviced children in the current school year is about $7100 per child. However, federal regulations require that Head Start funded agencies provide a wide variety of services for enrolled children including nutrition, social services, health and mental health, and transportation. Children enrolled in Head Start programs undergo a comprehensive screening process that includes evaluations of vision, speech, hearing and nutrition. Accordingly, only a portion of the $7100 per child federal funding would be available to pay for the high quality Abbott preschool program mandated to be available to all eligible children in the Abbott districts.

The Department's funding proposal for federally funded Head Start centers that were prepared to meet Abbott preschool substantive standards, including class size, teacher certification, and a ten-hour day (six hours of educational programs plus four hours of day care), 245 days per year, is—to put it mildly—perplexing. The Department offered to pay the difference between the Head Start agency's federal funding per child ($7100) and $9000 for classes with non-certified teachers or $10,000 for classes with

certified teachers—a net cost to the State of $2000 to $3000 per child. Predictably, virtually all of the Abbott district Head Start centers rejected that proposal, explaining that the available portion of the federal funds, after providing the federally mandated services, combined with the proposed State funding, was not adequate to pay for a high quality Abbott preschool program. The President of the New Jersey Head Start Association certified that when Head Start explained the impossibility of participation in Abbott preschool under the State's proposal, State officials asserted that Head Start agencies would be excluded from the program and the children serviced by the Head Start centers would be enrolled in district operated preschool classes.

The Court is informed that none of the Abbott districts have included proposed budgets designed to serve federally funded Head Start children in the 2001–02 preschool submissions to the Department. The record also contains evidence that the State's intransigence concerning funding has resulted in declining enrollment at Head Start centers because children are being solicited to participate in District operated programs. In addition, Head Start centers report substantial numbers of teacher and social worker resignations resulting from higher salaries available in District preschool programs.

Chief Judge Masin, in the OAL preceeding, clearly understood the indefensibility of the Department's position when he concluded that "*it is not possible to find that the DOE has acted in a reasonable and compliant manner.*" OAL Initial Decision at 47 (emphasis added). Chief Judge Masin recognized that by refusing to offer Head Start agencies more than $3000 over their federal funding per pupil, the State was committing itself to pay at least $9000 per pupil, if not more, to provide District operated preschool. He observed that

the Department violates both judicial intent and the regulatory spirit if it refuses to provide appropriate required levels of adequate funding, funding based on particularized need, to deficient but willing Head Start programs and thereby requires districts to duplicate the Head Start programs to the extent that they will have to provide not only the additional aspects of the deficient program, but also those

aspects that fall short of Abbott requirements, but are nevertheless a proper part of a preschool program.

[*Ibid.*]

As noted, the Court sides with Head Start, but its disposition leaves Head Start with no practical mechanism for enforcing the Court's ruling. The Court correctly recognizes that the 8000 Head Start children should not be excluded from Abbott preschool programs, and requires that "districts should utilize Head Start providers unless they are not 'able and willing to comply' with Abbott preschool standards, or unless the cost of doing so is demonstrably more expensive than other high-quality alternatives." *Ante* at 585, 790 *A.*2d at 873. But in implementing its holding, the Court outlines a standard that will require individualized evaluations of each *Abbott* Head Start center's funding needs, without providing an efficient and reliable procedure for resolving disputes or adverse decisions. The Court states:

The districts must develop budget proposals based on a careful analysis of a providers' pre-existing obligations and funding sources. The DOE need not offer additional funding for services designed to meet federal regulations or duplicate funding for services paid for by the federal government. Rather, reasonable supplemental funds must be provided so that Head Start (and other community providers if applicable) can meet the more demanding state pre-school standards.

[*Ibid.*]

Significantly, neither the New Jersey Head Start Association, participating as *amicus curiae,* nor any Head Start agencies are parties to this litigation and the districts, under the Department's supervision, have been ordered not to contract with Head Start providers. Therefore, no mechanism presently exists for enforcing the Court's holding.

Consistent with its determination that Abbott preschool funding disputes are to be resolved pursuant to the administrative appeal process, *ante* at 571, 790 *A.*2d at 862–63, the Court could order that any dispute between a district and a Head Start provider that is aggrieved by a preschool funding authorization issued to an Abbott district may qualify for review directly by means of that administrative process. In my view, however, that review proce-

dure will be cumbersome, protracted, and far less effective for the districts, the Head Start providers and the State than would be an adjudication, if other dispute resolution initiatives were unsuccessful, by a Special Master whose authority and expertise would be well suited to resolve these intricate and agency specific funding disputes. The Court should not forget that the DOE ignored its mandate in *Abbott VI* that children in Head Start programs not meeting DOE standards could not be excluded from Abbott preschool programs. It now must provide a quick and effective procedure to implement today's reiteration of its prior holding that the State has a duty to fund Abbott preschool services in federally funded Head Start agencies.

## C. *Funding and Educational Quality*

In view of the magnitude and scope of the problems concerning preschool funding and educational quality revealed by this record, the Court may be overconfident when it observes "that certain of the relief sought in this litigation has been provided by the Commissioner as a result of the administrative process." *Ante* at 562, 790 *A.2d* at 857–58.

Only two years ago this Court found to be inadequate, and inconsistent with the Commissioner's representations, the manner in which the Department was implementing this Court's order concerning high-quality preschool. *Abbott IV, supra,* 163 *N.J.* at 101, 748 *A.2d* 82. Although the Court generously attributed the "discrepancies" to "misunderstandings," *id.* at 100–01, 748 *A.2d* 82, we stated clearly that daycare standards would not satisfy the Abbott preschool mandate:

> We conclude that the DOE's use of community care providers staffed by uncertified teachers and governed by Department of Human Services (DHS) daycare standards violates the *Abbott V* requirement to establish quality preschool programs for three- and four-year old children. Our intervention is warranted now to assure that the implementation of preschool in the Abbott districts is faithful to the programs proposed by the Commissioner and accepted by this Court less than two years ago.

[163 *N.J.* at 101, 748 A.2d 82.]

In *Abbott VI,* the Court also lamented the adversarial relationship between the ELC and the Department, describing it as plagued by "suspicion and distrust. " *Id.* at 120, 748 *A.*2d 82. The Court noted that, in contrast, the coalition of educators and community care providers developed by the Association for Children of New Jersey (ACNJ) "demonstrat[ed]" the value of collaboration and consensus building. *Ibid.*

The Court's acknowledgment of the ACNJ's objectivity and impartiality gives added weight to the ACNJ's forceful and comprehensive criticism of the DOE's preschool implementation efforts in its *amicus* brief to this Court:

> Since ACNJ's last appearance before the Court, the Coalition's focus has shifted from developing appropriate early childhood program standards to monitoring implementation of the clear mandates articulated by the Court in *Abbott VI.*
>
> ... While the State has made some progress in moving toward the program standards required by the Court, its progress has not been sufficient to meet the mandated quality required by the Court with the time frames articulated in *Abbott VI.* After careful assessment, ACNJ believes that the State's failure is not simply a matter of experiencing difficulty in meeting new standards within expedited time frames, but instead reflects a fundamental and continued failure on the part of the State to meet the clear and unambiguous standards required by the Court.
>
> Despite the Court's hope for a "cooperative effort focused on the provision of high quality preschool programs" the State continues to approach program implementation in a piecemeal fashion.... Critical barriers remain to meeting the Court's standards in all [areas]: curriculum, teacher preparation, facilities, contracting with community providers, enrollment and outreach. Fundamental questions of responsibility remain unresolved, particularly between the Departments of Education (DOE) and Human Services (DHS) and the Economic Development Authority (EDA). These agencies have been ineffective in coordinating their efforts, leaving the school districts with insufficient guidance as to how to proceed on nearly every issue of implementation.... Program funding continues to be based on what the State is willing to pay, rather than on what children need. In short, the State' efforts since *Abbott VI* have been too little, too late, and too disjointed to meet the standards ordered by the Court fifteen months ago.
>
> ... The result of the State's approach to preschool implementation is what ACNJ feared when it last appeared before the Court: a two-tiered system of program quality between the school-based and community-based programs within districts. This two-tiered system fails to provide children with the equal educational opportunity that the Court envisioned and that the children deserve.

Although *Abbott V* was decided in May 1998, no substantive educational standards for Abbott preschool programs had been

adopted by the Department as of March 7, 2000, the date we decided *Abbott VI.* The Court admonished the Commissioner about the delay, observing discretely that "more concrete guidance for [the current] school year would have been preferable." *Abbott VI, supra,* 163 *N.J.* at 107, 748 *A.2d* 82. We ordered substantive standards to be adopted by April 2000, explaining:

> Without adequate standards the DOE will be unable to evaluate preschool programs or to prevent the development of a two-tiered system in which one group of children is offered daycare and another group is offered high-quality preschool. . . .
>
> Substantive educational guidance for all Abbott district preschool programs is an essential component of DOE's commitment to the Abbott districts and must be adopted by April 17, 2000, so that the districts will be able to prepare for the 2000–2001 school year.
>
> [*Abbott VI, supra,* 163 *N.J.* at 107, 748 *A.2d* 82.]

In response, the Department adopted a document entitled "Early Childhood Education Program Expectations: Standards of Quality" (Expectations) that, according to the Court, "outline[s] the goals of preschool education without, however, specifying the details of a curriculum aimed at achieving the desired results." *Ante* at 547, 790 *A.2d* at 879. Other characterizations of the Expectations are less generous than that of the Court. Cecelia Zalkind, Executive Director of ACNJ, stated in her June 15, 2001 certification:

> ACNJ has followed with great interest the development of expectations for preschool programs developed by the Department with the assistance of the Task Force convened last summer. While we believe that the expectations are an important first step, they do not provide the more specific program standards necessary to guide program implementation. . . .
>
> Our concern is that in view of the April 17 deadline set by the Court to establish clear program standards, the Department will simply refer to these expectations. In our view, the expectations are insufficient for this purpose. They need to be far more specific and directive. While they are an appropriate articulation of program goals, they must take the next step in terms of specificity to become the standards that the Court envisions in its opinion.

Dr. William Barnett, a professor in the Rutgers Graduate School of Education and Director of the Rutgers Center for Early Education Research, was even more critical of the DOE's Expectations document in his certification dated December 20, 2000:

(a) the document does not constitute substantive educational guidance or program standards to enable districts and community-based providers to implement preschool in accord with the *Abbott* quality standards, and uniformly across all programs; (b) in most instances, the document exhorts the reader to implement "developmentally appropriate practices" without explaining how this can and should be done; (c) the document focuses primarily on classroom activities and neglects program standards, program and child assessment, planning, budgeting, supervision, professional development, social and health services, and services and strategies for children with disabilities and limited-English proficiency; and (d) the document fails to establish clear, measurable standards of high quality classroom practice to which teaching staff can be held accountable.

The Court assumes that the Department's promise to supplement the Expectations with a more comprehensive curriculum strategy entitled Early Childhood Education Curriculum Framework (Framework), to be in final draft form by April 30, 2002, will resolve the issue of preschool education quality. I do not share the Court's confidence. Considering that four years will have elapsed between *Abbott V* (May 21, 1998) and the preparation of the basic preschool curriculum standards, and that review and implementation of these standards has yet to commence, I anticipate the occurrence of future controversy concerning preschool educational standards.

The funding issue has been even more contentious than the question of educational standards. In *Abbott VI*, this Court was sharply critical of both the DOE's failure to provide guidance to the districts concerning applications for preschool funding and its uniform "form-letter" rejection of all districts requests for supplemental funding. We stated:

Nonetheless, we cannot ignore the DOE's form-letter response to the districts' requests, and caution that *reasonable requests to fund supplemental programs must be handled fairly and quickly.*

... We urge the Commissioner to work with the districts to resolve funding issues expeditiously; when an amicable resolution is not possible, *decision making must occur early enough in the school year to allow programs to be implemented by the next school year.*

[*Abbott VI, supra,* 163 *N.J.* at 118–119, 748 *A.*2d 82 (emphasis added).]

Despite our insistence in *Abbott VI* on "decision making ... early enough in the school year," this record informs us that DOE decisions on twenty-three Abbott district preschool plans were

received between May 17 and June 8, 2001, and decision on the remaining seven district plans were received between June 8 and September 1, 2001. The Court understandably characterizes the DOE's compliance with our requirement for timely dispositions as "dismal," *ante* at 543, 790 *A.2d* at 846. The fact is that the Department blatantly ignored the Court's direction in *Abbott VI.* In the process, it eviscerated the right of districts to obtain timely review of funding decisions because the administrative appeal process ordered by the Court cannot possibly be effective if DOE funding decisions are delayed until a few months before the new school year begins. As the certification of Thomas Dunn Jr., Superintendent of the Elizabeth School District observes:

> The process for resolving our disputes with the DOE over non-approved elements of our early childhood plans and funding have been a continuing source of frustration. If we elect to challenge the DOE's decisions in the administrative process, the process has gotten so bogged down that, by the time we have settled our appeals, it's too late in the school year to actually implement effectively many of the program components we were able to secure through the appeal. I am also very skeptical that, if we pursue the process through the OAL and the Commissioner, that we will ever be successful in having the Commissioner overturn funding and programmatic limitations imposed by his own Department to reduce the State costs of our program. The current delays in decision making and the appeals process are a serious hurdle for the District to overcome in making sure we secure what our children need.

Although the Court's October Order attempts to address the issue of timely disposition by DOE in order to allow for effective administrative and appellate review, the likelihood is significant that funding disputes will arise subsequent to the Court-imposed deadline for DOE funding decisions on preschool program and budget proposals. The Court already has received conflicting submissions by the parties concerning the omission from the Court's scheduling order of deadlines for decision on preschool supplemental funding (Additional *Abbott v. Burke* State Aid). See *N.J.A.C.* 6A:24–7.1 (noting that for purposes of district-wide budget requests-due February 25, 2002–that seek Additional *Abbott v. Burke* State Aid, expenditures related to approved early childhood education plans are entitled to highest priority). Stated simply, DOE decisions on preschool supplemental funding requests will be

made substantially later than the deadlines contained in the Court's October Order, so that the expedited review procedure will not be applicable to those decisions. Moreover, the ELC continues to object to the DOE's continuing failure to provide the districts with adequate standards to guide their preparation of budget and program proposals including, by implication, the potential effect on those proposals of the preschool curriculum Framework to be completed by April 30, 2002.

The adequacy of district preschool funding for community care providers is an issue that pervades the existing record and appears likely to be a source of significant contention in the future. Several certifications in this record allege, as did Dr. Barnett's, that "the DOE has again instructed districts to limit the level of funding provided to community-based programs under contract with the district to $4500 per child." The certification of Joan Ponessa dated June 8, 2001 alleges that "the State has again [prescribed] a pre-set per pupil funding amount for community providers ... [with] no evidence that this pre-set amount will be sufficient to enable community providers to provide preschool at the *Abbott* quality standards." In its brief to the Court, the Association for Children of New Jersey asserts that "systemic inequity in funding exacerbates the problems faced by community programs in recruiting and retaining qualified teachers," noting that "school districts are in a better position than community providers to offer competitive salaries and comprehensive benefits." Acting Chief Judge Masin, commenting on the DOE's approval of a reduction from $5000 to $4500 per pupil in Paterson's funding for four-year olds attending community provider programs, expressed skepticism over the DOE's denial that it had mandated pre-set funding of community providers irrespective of need:

> However, since the reduction was to $4,500, the reduction seems suspiciously to have been based on some pre-set DOE rate calculation. Again, if this is true, a proposition that the DOE denies, no evidence explaining or justifying the adequacy of that rate has been presented. If this is not true, how was the $4,500 rate determined? In the face of a record lacking in explanation and documents that are

likewise empty, the appearance of the very arbitrariness that troubled the Court in *Abbott IV* is evident.

[OAL Initial Decision at 52.]

Despite the effort to facilitate administrative review reflected by the Court's October Order, the magnitude, complexity, and cost implications of preschool implementation virtually guarantee that, for the short term, disputes over funding, curriculum, facilities, Head Start, and other issues will arise and require prompt and reliable resolution. In my view, funding issues present the most difficult challenge for both the State and the Abbott districts. Although Abbott preschool programs obviously must be adequately funded to be effective, the issue of affordability cannot be overlooked. Few if any governmentally funded programs can claim entitlement to a blank check. Accordingly, the need for responsibility, pragmatism, and exceptional expertise is even more acute in the resolution of funding issues, for the benefit of the State as well as the districts. If the funding decisions that result from the administrative and judicial review process are too wide off the mark—either on the low or high end—the future of high quality Abbott preschool programs could be jeopardized. A highly qualified Special Master designated by this Court could offer stability, uniformity, practicality, and reduced friction to the dispute resolution process that to date has been virtually useless to all parties.

### III

In his landmark 1979 Harvard Law Review article entitled "The Forms of Justice," Professor Owen Fiss explained the value of the Special Master in institutional litigation:

The remedial phase in structural litigation is far from episodic. It has a beginning, maybe a middle, but no end—well, almost no end. It involves a long, continuous relationship between the judge and the institution; it is concerned not with the enforcement of a remedy already given, but with the giving or shaping of the remedy itself. The task is not to declare who is right or who is wrong, not to calculate the amount of damages or to formulate a decree designed to stop some discrete act. The task is to remove the condition that threatens the constitutional values. In some instances, where deinstitutionalization is conceivable, as in the mental health field, closing the institution may be a viable option. For the most part, in cases involving schools, prisons, welfare agencies, police departments, and

housing authorities, for example, that option is not available. Then the remedy involves the court in nothing less than the reorganization of an ongoing institution, so as to remove the threat it poses to constitutional values. The court's jurisdiction will last as long as the threat persists.

Limitations on our knowledge about organizational behavior, coupled with the capacity of organizations to adapt to the interventions by reestablishing preexisting power relationships, invariably result in a series of interventions—cycle after cycle of supplemental relief. *A long term supervisory relationship develops between the judge and the institution, for performance must be monitored, and new strategies devised for making certain that the operation of the organization is kept within constitutional bounds. The judge may even create new agencies—once again the special master—to assist in these tasks. In doing so, he reflects either doubts about the capacity of the existing parties to discharge these tasks or an awareness of the magnitude of these tasks.*

[Owen M. Fiss, The Supreme Court 1978 Term, *Foreword: The Forms of Justice*, 93 Harv. L.Rev. 1, 27–28 (1979)(emphasis added).]

Similarly, in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 92 *N.J.* 158, 456 *A.*2d 390 (1983), this Court explained that in institutional litigation the appointment of a special master is not to be regarded as a victory for either side, and that the master's value lies in assisting all parties in resolving their differences:

While the appointment of a master is discretionary, we believe that such appointment is desirable in many cases where the court orders a revision of the land use regulations, especially if that revision is substantial. We do not view the appointment of a master as punitive in the least; it is not designed to settle scores with recalcitrant municipalities. The point here is that we intend that the appointment of masters be viewed by the court as a readily available device, one to be liberally used. In our view the master is of potential help to all concerned: to the municipality, to the plaintiffs, to the court and counsel. He or she is an expert, a negotiator, a mediator, and a catalyst—a person who will help the municipality select from the innumerable combinations of actions that could satisfy the constitutional obligation, the one that gives appropriate weight to the many conflicting interests involved, the one that satisfies not only the Constitution but, to some extent, the parties as well.

[*Id.* at 282–83, 456 *A.*2d 390.]

This Court has a unique role in this late stage of the approximately thirty-year history of urban school litigation in New Jersey. At every step of the long and arduous path leading to funding adequacy and essential substantive educational reforms, this Court has been required to act as the catalyst for urban school reform. Successful implementation of preschool in the

Abbott districts, to a degree that will assure that the youngest children in those districts enter elementary school at grade level ready to learn, is among the most vital and indispensable components of that reform effort. Continued divisiveness among the community care providers, the districts, and the State can delay unduly the attainment of a successful preschool program for all eligible *Abbott* three–four–year–olds. Confronted with the disarray revealed by this record, the Court's unwillingness to ensure implementation of its judgment mandating high quality preschool in the Abbott districts by the designation of a Special Master could be misunderstood to signal a lack of resolve and a dilution of the determination, perseverance, and consistency that has characterized the Court's educational reform decisions over the past three decades. By declining to appoint a Special Master to assist all parties in arriving at a uniform, efficient, responsible, and cohesive dispute resolution process, the Court risks perpetuating the high degree of frustration, antagonism, delay, and deficient implementation that have plagued the State's efforts these past four years. Unwilling to take that risk, I respectfully dissent from the Court's disposition.

*Granting in part; denying in part*—Chief Justice PORITZ, and Justices COLEMAN, LONG, and LaVECCHIA—4.

*Concurring in part; dissenting in part*—Justice LaVECCHIA—1.

*Granting*—Justice STEIN—1.